ROB BONTA
Attorney General of California
MIGUEL A. NERI
Supervising Deputy Attorney General
STEFANO ABBASCIANO
Deputy Attorney General
State Bar No. 277680
  1515 Clay Street, 20th Floor
  P.O. Box 70550
  Oakland, CA  94612-0550
  Telephone:  (510) 879-0820
  Fax:  (510) 622-2270
  E-mail:  Stefano.Abbasciano@doj.ca.gov
*Attorneys for California Department of Corrections
and Rehabilitation; California Medical Facility*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARIA C. LUNA,**<br><br>Plaintiff,<br><br>v.<br><br>**CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; CALIFORNIA MEDICAL FACILITY,**<br><br>Defendants. | 20-cv-08097-EMC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION**<br><br>Date:          January 6, 2022<br>Time:          1:30 p.m.<br>Dept:          5<br>Judge:        The Honorable Edward M. Chen<br>Trial Date:   August 15, 2022<br>Action Filed:  November 12, 2020 |

# TABLE OF CONTENTS

**Page**

Issues to Be Decided ................................................................................................ 2

Introduction ............................................................................................................. 3

Statement of Facts ................................................................................................... 4

    I.      Plaintiff's Background and Role at California Medical Facility. .......................... 4

    II.     The IEX Incident ................................................................................................. 5

    III.    Plaintiff's Encounters with the Inmate Prior to the IEX Incident ......................... 6

    IV.   Plaintiff's Request and Defendants' Response to the IEX Incident ...................... 7

    V.     Plaintiff's Encounters with the Inmate Patient after the IEX Incident.................. 7

    VI.    CMF O-2 Building's Layout: CDCR Employees and Inmates Necessarily Share the Same Common Areas.......................................................................... 9

    VII.   CDCR's Mental Health Services Are under the Supervision of a Special Master Appointed by the Federal Court............................................................. 9

    VIII.  Summarily Transferring the Inmate Patient to Another Institution Would Go against the Special Master's Determinations. ................................................ 10

Procedural History ................................................................................................ 11

Legal Standards and Argument ............................................................................. 11

    I.      Summary Judgment Standard ........................................................................... 11

    II.     Plaintiff's Title VII Claim Fails Because Plaintiff Cannot Establish a Hostile Work Environment or Show that the Defendants Failed to Take Reasonable Action under the Circumstances.......................................................... 12

         A.    Hostile Work Environment ....................................................................... 13

         B.    Prison Liability for Inmate Sexual Harassment ......................................... 15

         C.    CDCR's Reasonable Response to Plaintiff's Reports of Inmate Harassment Preclude a Finding That CDCR Fostered a Hostile Work Environment. ................................................................................... 17

    III.   Plaintiff's State-Law Claims Fails against the Defendants.................................. 20

         A.    Plaintiff Cannot Assert Common-Law Claims Against the Defendants, Because Public Entities Can Only Be Sued for Statutory Claims............................................................................................ 20

         B.    The Workers' Compensation Act Preempts Plaintiffs' State-Law Claims. ..................................................................................................... 20

         C.    Plaintiff's Common-Law Claims Fail on the Merits Because Defendants' Actions Were Not Outrageous, and Plaintiff Cannot Show Either Bad Intent or Negligence on the Defendants' Part.............. 22

         i. Intentional Infliction of Emotional Distress.......................................... 22

         ii. Negligent Infliction of Emotional Distress. ......................................... 23

    IV.   Applicable Statutes of Limitations.................................................................... 24

         A. Plaintiff's Title VII Action Is Time Barred....................................... 24

i

1

**TABLE OF CONTENTS**
(continued)

2

**Page**

3

B. Plaintiff's State-law Claims are Time Barred. .................................... 25

4

Conclusion ........................................................................................................................... 25

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION FOR SUMMARY JUDGMENT/MEMORANDUM OF POINTS AND AUTHORITIES (20-cv-08097-EMC)

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4    *Adkins v. State of California*
5        (1996) 50 Cal.App.4th 1802 ................................................................................20

6    *Anderson v. Liberty Lobby, Inc.*
         477 U.S. 242 (1986)...........................................................................................12

7
     *Celotex Corp. v. Catrett*
8        477 U.S. 317 (1986)...........................................................................................12

9    *Chaconas v. JP Morgan Chase Bank*
10       (S.D. Cal. 2010) 713 F.Supp.2d 1180 ................................................................24

11   *Coleman v. Schwarzenegger*
         (E.D. Cal. 2009) 922 F.Supp.2d 882.........................................................7, 9, 10

12
     *Coleman v. Wilson*
13       (E.D. Cal. 1995) 912 F.Supp. 1282.....................................................7, 9, 10, 11

14   *Daniels v. CDCR*
         No. 2:10-cv-00003-MCE-AC, 2013 U.S. Dist. LEXIS 165897 (E.D. Cal. Nov.
15       20, 2013) ...........................................................................................................15

16   *Dove v. PNS Stores, Inc.*
17       (C.D. Cal. 1997) 982 F.Supp. 1420 ...................................................................23

18   *Eastburn v. Regional Fire Protection Authority*
         (2003) 31 Cal.4th 1175 .....................................................................................20
19
     *EEOC. v. Farmer Bros. Co.*
20       31 F.3d 891 (9th Cir.1994).................................................................................24

21   *Eisenberg v. Insurance Co. of North America*
         815 F.2d 1285 (9th Cir. 1987)............................................................................12
22
     *Ellison v. Brady*
23       924 F.2d 872 (9th Cir. 1991).........................................................................13, 16

24
     *Erhart v. BofI Holding, Inc.*
25       (S.D. Cal. 2017) 269 F.Supp.3d 1059 ................................................................21

26   *Folkerson v. Circus Circus Enters., Inc.*
27       107 F.3d 754 (9th Cir. 1997)..............................................................................15

28

1

## <u>TABLE OF AUTHORITIES</u>
### (continued)

2

<u>Page</u>

3

*Freitag v. Ayers*

4
   468 F.3d 52 (9th Cir. 2006)............................................................................ *passim*

*Fuller v. City of Oakland*

5
   47 F.3d 1522 (9th Cir.1995)...........................................................................13

6

*Galdamez v. Potter*

7
   415 F.3d 1015 (9th Cir. 2005)........................................................................15

8

*Gliatta v. Tectum, Inc.*
   211 F. Supp. 2d 992 (S.D. Ohio 2002) ..........................................................17

9

*Gregory v. Cott*

10
   (2014) 59 Cal.4th 996 ....................................................................................21

11

*Harris v. Forklift Sys., Inc.*

12
   510 U.S. 17 (1993) ........................................................................................14

13

*Hughes v. Pair*
   (2009) 46 Cal.4th 1051 ..................................................................................22

14

*Jackson v. Bank of Hawaii*

15
   902 F.2d 1385 (9th Cir. 1990)........................................................................12

16

*Langevin v. Fed. Exp. Corp.*

17
   No. CV 14-08105 MMM ...............................................................................21

18

*Little v. Windermere Relocation, Inc.*
   301 F.3d 958 (9th Cir. 2002.)........................................................................13

19

*Lyons v. England*

20
   307 F.3d 1092 (9th Cir. 2002)........................................................................24

21

*Maldonado v. Harris*

22
   370 F.3d 945 (9th Cir. 2004)..........................................................................25

23

*McGinest v. GTE Serv. Corp.*
   360 F.3d 1103 (9th Cir. 2004)........................................................................15

24

*Meritor Savings Bank v. Vinson*

25
   477 U.S. 57 (1986) ........................................................................................14

26

*Michael J. v. Los Angeles County Dept. of Adoptions*

27
   (1988) 201 Cal.App.3d 859............................................................................20

28

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3    *Miklosy v. Regents of University of California*
4        (2008) 44 Cal.4th 876 ..........................................................20, 21

5    *Miller v. Nat'l Broadcasting Co.*
        (1986) 187 Cal.App.3d 1463 ....................................................23
6
7    *Mohebbi v. Khazen*
        50 F. Supp. 3d 1234 (N.D. Cal. 2014) .......................................23

8    *Moore v. Greene*
        431 F.2d 584 (9th Cir. 1970).....................................................23
9

10   *Nally v. Grace Cmty. Church*
        47 Cal. 3d 278 (1988) ..............................................................22
11
     *Oncale v. Sundowner Offshore Servs., Inc.*
12      523 U.S. 75 (1998).....................................................................14

13   *Plata v. Newsom*
        (N.D.Cal., No. 01-cv-01351-JST,).................................................7
14

15   *Potter v. Firestone Tire & Rubber Co.*
        (1993) 6 Cal.4th 965 ..........................................................22, 23, 24
16
     *Powell v. Morris*
17      37 F. Supp. 2d 1011 (S.D. Ohio 1999) .......................................15, 18

18   *Scott v. Henrich*
        978 F.2d 481 (9th Cir. 1992)......................................................12
19

20   *Slayton v. Ohio Dept. of Youth Servs.*
        206 F.3d 669 (6th Cir. 2000)..........................................14, 15, 18
21
     *Sommantino v. United States*
22      255 F.3d 704 (9th Cir. 2001)......................................................24

23   *Turnbull v. Topeka State Hosp.*
        255 F.3d 1238 (10th Cir. 2001) ...................................................18
24
     *Wallace v. Kato*
25      549 U.S. 384 (2007)...................................................................25

26   *Wolff v. McDonnell*
        418 U.S. 539 (1974)......................................................................7
27

28

## TABLE OF AUTHORITIES
### (continued)

Page

*Wright v. State*
    (2015) 233 Cal.App.4th 1218 ................................................................20

*Yau v. Santa Margarita Ford, Inc.*
    (2014) 229 Cal.App.4th 144 ...........................................................20, 21

*Zelig v. County of Los Angeles*
    (2002) 27 Cal.4th 1112 ......................................................................20

*Zipes v. Trans World Airlines*
    455 U.S. 385 (1982) ..........................................................................24

**STATUTES**

42 U.S.C.
    § 2000e–5(b) ....................................................................................24
    § 2000e–5(e)(1) ...............................................................................24
    § 2000e–5(f) (1) ..............................................................................24

California Code of Civil Procedure
    § 335.1 .............................................................................................25

California Code of Regulations, Title 15
    § 3312(a)(3) .....................................................................................18
    § 3315(a)(1) .....................................................................................18
    § 3315(f)(5)(K) ................................................................................18
    § 3323(d)(9) .....................................................................................18
    § 3323(f)(5) ......................................................................................18

California Government Code
    § 810 et seq. .....................................................................................20
    § 815 ................................................................................................20
    § 815(a) ............................................................................................20

California Labor Code
    § 3602(a) ..........................................................................................20

California Penal Code
    § 314 ................................................................................................18

**COURT RULES**

Federal Rules of Civil Procedure
    § 56 ..................................................................................................11

1

## <u>TABLE OF AUTHORITIES</u>
(continued)

2
<u>Page</u>

3
**OTHER AUTHORITIES**

4
29 Code of Federal Regulations
5
   § 1604.11(e) ........................................................................................................16

6
California Code of Regulations, Title 15
   § 3001 ....................................................................................................................18
7
   § 3007 ...............................................................................................................18, 19
   § 3316 ....................................................................................................................18
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   TO PLAINTIFF AND HER ATTORNEY OF RECORD:

2   PLEASE TAKE NOTICE that on January 6, 2022, at 1:30 p.m. or as soon thereafter as the

3   matter may be heard in Courtroom 5 of the above-entitled Court, in its San Francisco Division

4   courthouse, defendants California Department of Corrections and Rehabilitation and California

5   Medical Facility (collectively, "Defendants") will and hereby do move this Court for summary

6   judgment or, in the alternative, partial summary judgment, under Federal Rule of Civil Procedure,

7   Rule 56, on the grounds that there are no genuine issues of material facts and defendants are

8   entitled to judgment as a matter of law.

9   Specifically, Defendants are entitled to summary judgment on Plaintiff's Title VII (42

10  U.S.C. § 2000e et seq.) claim of hostile work environment on the grounds that Plaintiff cannot

11  establish that any defendant's conduct violates applicable law as a matter of law. Further,

12  Defendants are entitled to summary judgment on the common-law state-law claims alleged by

13  Plaintiff on the grounds that Plaintiff cannot assert these claims against the Defendants as a matter

14  of law, and they are preempted by the Workers' Compensation Act. Finally, Defendants are

15  entitled to summary judgment on the grounds that all of Plaintiff's claims are time barred.

16  This motion is based upon this notice of motion and motion, the memorandum of points and

17  authorities in support, the reply brief to be filed in support of this motion, the Declaration of

18  Stefano Abbasciano and all exhibits to the declaration, the papers and pleadings on file in this

19  matter, and on such oral argument and any other matters this Court may properly consider.

20  Dated:  November 19, 2021                Respectfully submitted,

21                                          ROB BONTA
                                            Attorney General of California
22                                          MIGUEL A. NERI
                                            Supervising Deputy Attorney General
23

24                                          */s/Stefano Abbasciano*

25                                          STEFANO ABBASCIANO
                                            Deputy Attorney General
26                                          *Attorneys for California Department of*
                                            *Corrections and Rehabilitation; California*
27                                          *Medical Facility*

28

1

1   ROB BONTA
    Attorney General of California
2   MIGUEL A. NERI
    Supervising Deputy Attorney General
3   STEFANO ABBASCIANO
    Deputy Attorney General
4   State Bar No. 277680
     1515 Clay Street, 20th Floor
5    P.O. Box 70550
     Oakland, CA  94612-0550
6    Telephone:  (510) 879-0820
     Fax:  (510) 622-2270
7    E-mail:  Stefano.Abbasciano@doj.ca.gov
    *Attorneys for California Department of Corrections*
8   *and Rehabilitation; California Medical Facility*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12

13

14  | **MARIA C. LUNA,** | 20-cv-08097-EMC |
    | | |

15  | Plaintiff, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** |

16  | **v.** | |

17  | **CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION; CALIFORNIA MEDICAL FACILITY,** | Date:        January 6, 2022
    Time:        1:30 p.m.
    Dept:        5
    Judge:       The Honorable Edward M. Chen |

18

19  | | Trial Date:    August 15, 2022 |
    | Defendants. | Action Filed:  November 12, 2020 |

20

21                          **ISSUES TO BE DECIDED**

22       1.    Whether the Court should order judgment for Defendants on Plaintiff's claim for

23  hostile work environment because Plaintiff has failed to establish facts supporting her claim that

24  any of the Defendants violated any applicable law.

25       2.    Whether the Defendants are immune from liability under California law for Plaintiff's

26  state-law claims.

27       3.    Whether the Workers' Compensation Act preempts Plaintiff's state-law claims.

28

                                          2

4.      Whether the Court should order judgment for Defendants on Plaintiff's state-law claims because Plaintiff has failed to establish facts supporting her claims that any of the Defendants violated any applicable law.

5.      Whether the Court should order judgment for Defendants on Plaintiff's claims because they are time barred.

**INTRODUCTION**

Plaintiff Maria C. Luna ("Plaintiff") has been employed by Defendant California Department of Corrections and Rehabilitation ("CDCR") since June 2004 as a registered nurse at CDCR's California Medical Facility in Vacaville ("CMF"). In 2016 or 2017, Plaintiff requested to be assigned to work with male inmates at the psychiatric unit at CMF, which hosts inmate patients with medical and mental health issues requiring medical intervention. While working in the psychiatric unit, Plaintiff was exposed on one occasion to an indecent exposure ("IEX") by an inmate patient named Clifton[1] (the "Inmate Patient"). The Inmate Patient is not a defendant in this case, however. Instead, Plaintiff has filed this action against CDCR and CMF, alleging that they created a hostile work environment. She further contends that the Defendants permitted the harassment that caused the alleged hostile work environment to exist. Additionally, Plaintiff alleges that the Defendants intentionally and/or negligently inflicted emotional distress on her based on the same, one-time IEX incident and their allegedly inadequate response to the incident.

Plaintiff cannot establish any triable issues of fact to support her Title VII claim that the Defendants are in any way liable. Plaintiff chose to work at CMF, a prison reserved for most difficult-to-manage inmate patients with physical and mental-health disabilities. Over a fourteen-year period, Plaintiff reported only one incident of inmate IEX, on February 9, 2018 (the "IEX Incident",) which did not involve any sort of physical contact, and three later accidental encounters with the Inmate Patient at CMF that did not result in any contact or verbal or visual harassing interactions, and did not require any guard intervention. As a trained registered nurse with over 14 years of experience in a challenging environment filled with dangerous inmate

---

[1] The Inmate Patient's last name is not included in order to protect the privacy of his medical information.

3

patients with mental health issues, Plaintiff cannot show these incidents constituted severe or pervasive harassment sufficient to establish an objectively abusive work environment. Plaintiff erroneously contends that the Defendants failed to take any action in response to the IEX Incident. On the contrary, CDCR disciplined the Inmate Patient to the maximum extent allowed, took appropriate corrective measures against him, and also referred him for criminal prosecution. Once Plaintiff reported the IEX Incident, CDCR immediately followed the protocol in place to address IEX incidents at the prison. Accordingly, CDCR conducted an administrative hearing and found the Inmate Patient guilty. As a consequence, the Inmate Patient was disciplined by being placed in administrative segregation, losing a number of benefits including conduct credits, and was required to wear an exposure control jumpsuit for 90 days. Additionally, the Inmate Patient was also immediately removed from Plaintiff's class and – as requested by Plaintiff – he was banned from ever attending her class. CDCR also reported the Inmate Patient to the Solano County District Attorney's Office for potential criminal prosecution.

Plaintiff's remaining claims for intentional and negligent infliction of emotional distress are also meritless. First Plaintiff cannot assert common-law claims against the Defendants as a matter of law. Furthermore, the California Workers' Compensation Act preempts Plaintiff's claims. Additionally, Plaintiff cannot establish any triable issues of fact to support her claim that the Defendants acted intentionally, in reckless disregard, or even negligently, or that the alleged acts of the Defendants are so egregious that they satisfy the standard for these tort causes of action. Finally, all of Plaintiff's claims are time barred by the applicable statutes of limitations.

Given the above, the Court should grant summary judgment in favor of the Defendants on all of Plaintiff's claims.

## STATEMENT OF FACTS

### I.   PLAINTIFF'S BACKGROUND AND ROLE AT CALIFORNIA MEDICAL FACILITY.

Plaintiff is a CDCR registered nurse at CMF's Vacaville location. (Plaintiff's Deposition, Exhibit A to the Declaration of Stefano Abbasciano ("Abbasciano Decl.") at 12:18-24.) Plaintiff began working at CMF on June 4, 2004 (Plaintiff's Deposition, at 12:10-13.) CMF's mental health department treats inmate patients that have been convicted of crimes and have certain

4

mental-health issues. (Plaintiff's Deposition, at 22:23-23:11.) Starting in 2016 or 2017, Plaintiff requested to be assigned to the psychiatric unit at CMF. (Plaintiff's Deposition, at 14:10-14.) In her capacity as a registered nurse assigned to CMF's psychiatric unit, Plaintiff works as an instructor, educating inmate patients regarding subjects on mental and medical health issues and, at the same time, trying to help them by referring them to doctors for treatment. Plaintiff also triages inmate patients with their medical and mental concerns, assessing what medical issues need to be treated. (Plaintiff's Deposition, at 12:25-13:12.) Plaintiff would administer five one-hour classes a day, five days a week, to regularly scheduled groups of 14 inmate patients at a time. (Plaintiff's Deposition, at 16:2-17; 39:14-22.) Plaintiff is one of the two registered nurses who administer group classes at CMF (Plaintiff's Deposition, at 17:1-20), with Plaintiff's classes held on the third floor and the other nurse's classes held on the second floor of the O-2 building.[2] (Plaintiff's Deposition, at 39:23-40:7.) Both nurses' classes have the same schedule. (Plaintiff's Deposition, at 40:8-17.) Plaintiff chose to work at CMF because it is close to her house. (Plaintiff's Deposition, at 79:20-80:1.) Also, Plaintiff voluntarily applied to work in the psychiatric unit because the schedule assigned to her would work well with that of her family (Plaintiff's Deposition, at 24:16-19), and Plaintiff noted she "loves" teaching group classes to inmate patients at CMF (Plaintiff's Deposition, at 43:24-44:5.) During the course of her over-14-year tenure as an employee of CMF, except for the IEX Incident, Plaintiff never experienced any IEX incidents involving the Inmate Patient or any other inmate patients. (Plaintiff's Deposition, at 33:16-19; 42:25-43:11.) When an inmate patient does not act appropriately, such as by disrupting a session, Plaintiff deals with the problem right away before it escalates, and calls an officer only if the inmate patient refuses to leave as instructed. (Plaintiff's Deposition, at 114:9-21.)

## II.   THE IEX INCIDENT

Plaintiff's claims are based on one IEX Incident. On February 9, 2018, Plaintiff was conducting a group session with a group of inmate patients at CMF, when the Inmate Patient

---

[2] Group classes and medical appointments at CMF are held in a three-story, rectangular-shaped building known as the O-2 building (Plaintiff's Deposition, at 17:21-25; 18:12-13,) which is connected to the building where inmates are held through a secured entrance guarded by CDCR officers, who check inmate patients to make sure that they are scheduled for an appointment or a group class (Plaintiff's Deposition, at 52:10-19.)

5

1   committed a single act of IEX in her presence (Plaintiff's Deposition, at 25:25-26:22.) The

2   incident did not involve any physical contact between the Inmate Patient and Plaintiff, and the

3   Inmate Patient did not try to assault, approach, come close to, or touch Plaintiff. (Plaintiff's

4   Deposition, at 29:5-17.) During group classes, inmate patients sit on heavy benches that they

5   cannot carry for safety reasons. (Plaintiff's Deposition, at 22:3-7.) Specifically, the IEX incident

6   consisted of the Inmate Patient exposing himself and masturbating while staring at Plaintiff

7   during a group class. (Plaintiff's Deposition, at 25:25-26:22.) CDCR staff are equipped with an

8   alarm and a whistle to call for guards' assistance. (Plaintiff's Deposition, at 28:14-19.) However,

9   in response to the IEX, Plaintiff did not activate the alarm, instead she left the room. (Plaintiff's

10  Deposition, at 28:20-25.) Once in the hallway, Plaintiff saw the regular guards on that wing,

11  called for help, and the guards arrived promptly. (Plaintiff's Deposition, at 27:15-23.) By running

12  out of the room, Plaintiff lost her balance and reinjured her left ankle, which she had previously

13  injured at work. (Plaintiff's Deposition, at 27:8-13.) Plaintiff ordered the Inmate Patient to step

14  out of the room and he complied with this order (Plaintiff's Deposition, at 28:1-6.) Guards

15  handcuffed the Inmate Patient and temporarily put him in isolation in the O-2 wing, away from

16  everyone. (Plaintiff's Deposition, at 28:7-9.) Plaintiff reported the incident to the officers on duty,

17  her direct supervisor, and the sergeant on duty. (Plaintiff's Deposition, at 30:18-31:9.)

18  **III.   PLAINTIFF'S ENCOUNTERS WITH THE INMATE PRIOR TO THE IEX INCIDENT**

19        The Inmate Patient had been attending Plaintiff's group classes for over one year prior to

20  the IEX Incident. (Plaintiff's Deposition, at 31:10-24.) Prior to this incident, the Inmate Patient

21  had never engaged in any similar sexual conduct in Plaintiff's presence. (Plaintiff's Deposition, at

22  33:10-23.) Plaintiff had never expressed any safety concerns regarding the Inmate Patient prior to

23  the IEX incident. (Plaintiff's Deposition, at 34:23-35:1.) At no time prior to the incident did

24  Plaintiff feel threatened by the Inmate Patient, even after the Inmate Patient told Plaintiff that he

25  had been convicted of murdering an Asian woman by hitting her head with a big rock and leaving

26  her dying on the ground. (Plaintiff's Deposition, at 55:18-56:15.) In her 14-year tenure at CMF,

27  Plaintiff had never experienced any behavioral issues with an inmate other than the one involving

28  the Inmate Patient (Plaintiff's Deposition, at 85:11-24.)

**IV.   PLAINTIFF'S REQUEST AND DEFENDANTS' RESPONSE TO THE IEX INCIDENT**

In reporting the IEX Incident, Plaintiff specifically requested that the Inmate Patient no longer be allowed to participate in her group classes. (Exhibit C to Abbasciano Decl.) Plaintiff contends that the Defendants took no action for her safety. (Plaintiff's Deposition, at 84:13-19.) On the contrary, CDCR promptly and forcefully responded to the incident Plaintiff reported and took the maximum actions allowed[3] in an effort to discourage and punish the Inmate Patient.

Following the incident, the Inmate Patient was found guilty of the charge (Exhibit D to Abbasciano Decl.), disciplined to the maximum extent allowed in CMF's disciplinary system (Exhibit D to Abbasciano Decl.), and referred to the local Solano County District Attorney for prosecution. (Exhibit D to Abbasciano Decl.) Additionally, CDCR permanently banned the Inmate Patient from attending Plaintiff's group classes. (Plaintiff's Deposition, at 31:10-16; 38:13-17; 44:24-45:6.) Finally, Plaintiff admitted that CDCR followed the departmental policy concerning inmate sexual misconduct. (Exhibit C to Abbasciano Decl.)

**V.   PLAINTIFF'S ENCOUNTERS WITH THE INMATE PATIENT AFTER THE IEX INCIDENT**

Other than on February 9, 2018, Plaintiff never experienced or witnessed any IEX incidents involving the Inmate Patient or any other inmate patient at CMF. (Plaintiff's Deposition, at 85:11-24.) The Inmate Patient was immediately removed from Plaintiff's class and assigned to a different group class with a different Registered Nurse. (Plaintiff's Deposition, at. 38:13-39:9.)

Months later, in October 2018, while she was administering a group class in the O-2 building, Plaintiff contends that she saw the Inmate Patient in the hallway allegedly looking at her

---

[3] CDCR cannot indefinitely restrict inmates from accessing the medical facility or other parts of the prison. Courts have recognized that, though a prisoner's rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for a crime. "There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners may not be deprived of life, liberty, or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Similarly, CDCR has a duty to protect the Inmate Patient's Eighth Amendment right to adequate medical care, particularly in light of the fact that CDCR's medical services have been under federal receivership, and the federal court's supervision, since 2006 pursuant to the case now known as *Plata v. Newsom* (N.D.Cal., No. 01-cv-01351-JST,) and mental services are regulated by a Special Master pursuant to *Coleman*, such that the Inmate Patient cannot be banned from accessing the O-2 building to receive medical treatment (*Coleman v. Wilson* (E.D. Cal. 1995) 912 F.Supp. 1282; *Coleman v. Schwarzenegger* (E.D. Cal. 2009) 922 F.Supp.2d 882, 898, 899.)

1   from a distance through the classroom window that faces the hallway. (Plaintiff's Deposition, at

2   45:9-46:19.) Inmate patients wait in the hallway when they are preparing to start a group class or

3   have a medical appointment (Plaintiff's Deposition, at 18:4-9). It is possible to see almost all the

4   inmates in the middle center of the hallway from the classroom, which has big glass windows,

5   including the door [facing the hallway]. (Plaintiff's Deposition, at. 46:5-8.) During that episode,

6   the Inmate Patient did not talk to or gesture at Plaintiff, nor did he try to approach Plaintiff, and

7   Plaintiff continued to teach her class. (Plaintiff's Deposition, at 50:11-20.) When Plaintiff turned

8   around again after finishing her class, the Inmate Patient was gone. (Plaintiff's Deposition, at

9   50:21-24.) A couple of weeks later, Plaintiff ran into the Inmate Patient in the hallway of the O-2

10  building. When Plaintiff saw him in the hallway, she stopped to talk to janitorial staff to allow the

11  Inmate Patient to continue walking. Once she was done with her conversation, the Inmate Patient

12  was gone, possibly inside one of the classrooms. (Plaintiff's Deposition, at 46:10-47:15.) In both

13  cases, there was no interaction, verbal communication, or physical contact between Plaintiff and

14  the Inmate Patient. (Plaintiff's Deposition, at 52:10-20; 55:1-14.) Accordingly, no guard

15  intervention was required. (Plaintiff's Deposition, at 73:5-74:2; 77:12-23.)

16      Finally, in late November 2018, the Inmate Patient temporarily entered Plaintiff's

17  classroom as she was about to start her group class, asking whether he could attend it. (Plaintiff's

18  Deposition, at 74:10-75:13.) Plaintiff ordered him to leave and the Inmate Patient left. (Plaintiff's

19  Deposition, at 75:14-76:2.) Plaintiff did not activate the alarm or seek help from the prison guards

20  because the Inmate Patient complied with her order and exited the classroom, sitting on one of the

21  benches in the hallway. (Plaintiff's Deposition, at 77:5-18.) This interaction lasted 2 minutes, and

22  Plaintiff did not report that the Inmate Patient acted with discourtesy or in an aggressive or

23  otherwise threatening fashion (Exhibit E to Abbasciano Decl.) A few weeks after this last

24  encounter with the Inmate Patient, Plaintiff went on workers' compensation. Her last day at work

25  was December 12, 2018. (Plaintiff's Deposition, at 81:13-23.) Plaintiff never asked to be

26  transferred to a different institution because that position works for her schedule, is close to her

27  house, and is convenient to what her family needs (Plaintiff's Deposition, at 79:20-80:1.)

28

## VI.   CMF O-2 Building's Layout: CDCR Employees and Inmates Necessarily Share the Same Common Areas

The O-2 building's left side hosts classrooms where group classes are administered, while on the right side there are doctors' offices, psychologists' clinics, and social workers' clinics, where inmates have individual visits and medical appointments. (Plaintiff's Deposition, at 18:1-3.) The hallway in the center of the O-2 building separating the classrooms from the doctors' offices hosts benches where the inmates wait for their turn to go to a doctor's office or to attend a class (Plaintiff's Deposition, at 18:4-9.) All those accessing the O-2 building, including inmates, CDCR/CMF staff, and contractors, necessarily share the same hallway, which is the only access way to the O-2 building (Plaintiff's Deposition, at 87:11-88:3.) Inmates are admitted into the O-2 building by walking from their cells through a checkpoint where prison guards confirm that inmates have a valid reason to enter, such as a medical appointment or a group session. (Plaintiff's Deposition, at 52:10-19.) The distance between the classrooms and the benches in the middle of the hallway in the O-2 building is approximately 8 feet (Plaintiff's Deposition, at 48:15-49:3) and, due to group class and medical appointment schedules, generally there are hundreds of inmates in the O-2 building at once waiting, so it is hard to see who one may meet. (Plaintiff's Deposition, at 18:21-19:7.) Accordingly, Inmate Patient was in the O-2 building for a valid reason such as attending a group class or for a medical appointment, otherwise guards would not have allowed him entry (Plaintiff's Deposition, at 52:1-12.)

## VII.   CDCR's Mental Health Services Are under the Supervision of a Special Master Appointed by the Federal Court.

On September 13, 1995, the United States District Court held that CDCR was not providing adequate mental-health care to inmates with serious mental disorders under the Eighth Amendment of the United States Constitution. *Coleman v. Wilson* (E.D. Cal. 1995) 912 F.Supp. 1282; *Coleman v. Schwarzenegger* (E.D. Cal. 2009) 922 F.Supp.2d 882, 898, 899. The *Coleman* court found that CDCR failed to provide proper screening, timely access to appropriate levels of care, an adequate medical record system, proper administration of psychotropic medication, competent staff in sufficient numbers, and a basic suicide-prevention program to meet a

9

minimally adequate prison mental-health-care delivery system. *Coleman v. Wilson* (E.D. Cal. 1995) 912 F.Supp. 1282; *Coleman v. Schwarzenegger* (E.D. Cal. 2009) 922 F.Supp.2d 882, 900. Accordingly, the court entered an order for injunctive relief requiring CDCR to develop plans to remedy the constitutional violations under the supervision of a Special Master. *Coleman v. Wilson* (E.D. Cal. 1995) 912 F.Supp. 1282; *Coleman v. Schwarzenegger* (E.D. Cal. 2009) 922 F.Supp.2d 882, 900.

## VIII. SUMMARILY TRANSFERRING THE INMATE PATIENT TO ANOTHER INSTITUTION WOULD GO AGAINST THE SPECIAL MASTER'S DETERMINATIONS.

Plaintiff's position is that the Inmate Patient should have been transferred out of CMF after the one IEX incident. (Plaintiff's Deposition, at 91:23-92:12.) However, in addressing a similar situation at Pelican Bay State Prison ("PBSP"), the Special Master expressly determined the staff members' concern about protecting themselves from witnessing indecent exposure to be "irrelevant" to CDCR's obligation to treat the inmate if the dysfunctional behavior stems from a mental disorder:

> Exacerbating the lack of responsive mental health care for this group of inmates was the frequent passing of disciplinary charges whenever they exhibited themselves or publicly masturbated. At least two CSP/Corcoran inmates were facing potential third-strike convictions and life sentences on charges referred by the institution to the local district attorney for dysfunctional behavior that appear to be related to their mental illness, which had been neither diagnosed nor treated by the institution's mental health staff. … In their objections to this portion of the draft report, the defendants point out irrelevantly that the issue arose in PBSP because correctional personnel brought suit against the department for its failure to protect staff adequately from exposure to instances of exhibitionism and public masturbation by a small number of inmates. The defendants also argue that paraphilia do not constitute a serious mental illness within the ambit of the *Coleman* case and deny that inmates have any constitutional right to the treatment of paraphilia. Discussion of this issue needs to be more sharply focused. The [Diagnostic Manual of Mental Disorders] ("DSM IV") lists nine different categories of paraphilia. The PBSP situation and the cases identified as problematic in CSP/Corcoran in this report deal with only one of the listed categories, exhibitionism, and collaterally related instances of public masturbation. Within the correctional context, some inmates afflicted with this Axis I sexual disorder expose themselves to staff and fellow inmates and/or masturbate publicly. Typically and periodically, such behavior results in multiple RVRs and referrals to local prosecutors, with a potential in some instances for life sentences. Not every instance of public exposure and/or masturbation is related to a serious mental disorder. That is why the PBSP program, the so-called Inmate Exhibitionist Masturbation Screening and Assessment Program, focuses on both diagnostic evaluation of the involved inmate and the provision of responsive treatment aimed specifically at curbing the offending and dysfunctional behavior

10

associated with the mental disorder. The defendants' constitutional scruples against the treatment urged here really addresses the broader issue of the state's obligation to provide 'curative' treatment for inmates incarcerated, sometimes indefinitely, for sexual offenses. The defendants' definition of medical necessity in the *Coleman* case, embedded in the provisionally approved program guides, requires intervention to 'treat significant disability/dysfunctionality in an individual diagnosed with or suspected of having a mental disorder.' Once an inmate's exhibitionism/public masturbation has been assessed as stemming from a mental disorder, the defendants are obligated to provide treatment to help the inmate curb the dysfunctional behavior associated with the disorder.

*13th Monitoring Report of the Special Master on the Defendants' Compliance With Provisionally Approved Plans, Policies, and Protocols*, at pp. 98-100 (Exhibit F to Abbasciano Decl.)

In this case, there were grounds to believe that the Inmate Patient's mental condition contributed to his IEX incident with Plaintiff. At a March 12, 2018 disciplinary hearing on the matter, the Inmate Patient admitted that "I messed up. I'm seeking help by attending the program the board recommended to help me with this issue." The assessing clinician indicated that the Inmate's mental disorder contributed to the behavior at the time of the offense (See Exhibit D to Abbasciano Decl.) Plaintiff also admitted that she was aware that the Inmate Patient had been identified as an IEX inmate <u>prior</u> to the incident with her. (Exhibit C to Abbasciano Decl.) Therefore, given the special master's concerns, the CDCR could not have summarily transferred the Inmate Patient due to the role of his mental condition in the IEX incident.

## PROCEDURAL HISTORY

The Complaint in this action was filed on November 12, 2020, and named both CDCR and CMF as defendants.  (Dkt. No. 1.) The Defendants filed an answer on January 20, 2021, asserting various denials and affirmative defenses, including statute of limitations. (Dkt. No. 10.)

## LEGAL STANDARDS AND ARGUMENT

### I.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56. The moving party's burden under Rule 56 is met simply by "`showing' – i.e., pointing out to the District Court – that there is an absence of evidence to support the nonmoving party's

11

1   case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party shows the

2   absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to produce

3   evidence which would support a jury verdict in his favor. *Anderson v. Liberty Lobby, Inc*., 477

4   U.S. 242, 256-257 (1986). To meet this burden, the nonmovant cannot rely on the pleadings but

5   must show by affidavits, depositions, answers to interrogatories or by admissions that a genuine

6   issue of material fact exists. *Celotex*, supra, 477 U.S. at 324. The nonmoving party's failure of

7   proof on an essential element of its claim renders all other facts immaterial. *Id*. at 322-323.

8       While facts and inferences must be construed in favor of the nonmoving party, the record

9   must be sufficient for the fact-finder to conclude the inference offered by the nonmovant is more

10  likely than not true. A scintilla of evidence will not suffice. *Scott v. Henrich*, 978 F.2d 481, 484

11  (9th Cir. 1992). The more implausible the claim or defense asserted by the nonmoving party, the

12  more persuasive its evidence must be to avoid summary judgment. *Jackson v. Bank of Hawaii*,

13  902 F.2d 1385, 1389 (9th Cir. 1990). If any evidence produced against a defendants' motion is

14  "merely colorable" or "not significantly probative," the motion must be granted. *Id*. at 249;

15  *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir. 1987).

16      Summary judgment is appropriate here on all claims. First, the Defendants are entitled to

17  summary judgment on Plaintiff's Title VII claim because Plaintiff failed to establish facts

18  supporting her claim that any of the Defendants violated any applicable law. Second, Defendants

19  are entitled to judgment on Plaintiff's common-law claims against the Defendants, because public

20  entities can only be sued for statutory claims. Third, the Workers' Compensation Act preempts

21  Plaintiff's state-law claims. Fourth, even if Plaintiff is found to be allowed to assert common-law

22  claims against the Defendants, Defendants are entitled to summary judgment because Plaintiff has

23  failed to establish facts supporting her claims that any of the Defendants violated any applicable

24  law. Finally, the Court should order judgment for Defendants on all of Plaintiff's claims because

25  they are time barred.

26      ///

27      ///

28

## II.   PLAINTIFF'S TITLE VII CLAIM FAILS BECAUSE PLAINTIFF CANNOT ESTABLISH A HOSTILE WORK ENVIRONMENT OR SHOW THAT THE DEFENDANTS FAILED TO TAKE REASONABLE ACTION UNDER THE CIRCUMSTANCES

Plaintiff's Title VII claim fails on the merits because Plaintiff will not be able to establish a hostile work environment or show that the Defendants failed to take reasonable action under the circumstances. To prevail on a Title VII claim under a hostile-work-environment theory in a prison setting, Plaintiff must first establish (1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist. *Freitag v. Ayers*, 468 F.3d 52, 5398 (9th Cir. 2006). To establish the existence of a hostile work environment, Plaintiff must prove that: "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) this conduct was sufficiently severe or pervasive to alter the conditions of ... employment and create an abusive working environment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (internal quotations and citation omitted). *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002.) To the extent an inmate openly exposed himself and masturbated, that conduct would be considered both sexual in nature and unwelcome as far as a Plaintiff is concerned. The critical issue is whether an inmate's conduct was sufficiently "severe or pervasive" to create an abusive working environment for Plaintiff. In making this determination, the Ninth Circuit requires that the totality of the circumstances be considered, including whether the harassment was both objectively and subjectively abusive. *Fuller*, 47 F.3d at 1527. A court need not address Title VII liability unless Plaintiff first demonstrates the existence of a hostile work environment. Liability for inmate sexual harassment depends, not on the inmate's conduct, but instead on the prison's response to the inmate's conduct. The prison is not liable if it has taken corrective measures reasonably calculated to end the harassment, with the issue of reasonableness hinging on the promptness of the prison's response and its ability to stop the harassment. *Freitag*, 468 F.3d at 539-40 citing *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991).

### A.   Hostile Work Environment

Plaintiff was actively employed from 2004 to 2018 as a registered nurse in CMF's psychiatric unit, responsible for offering medical treatment to inmates with mental disabilities, in

13

1   what could reasonably be described as a job that is extremely stressful on a daily basis. The

2   evidence established that in her 14-plus years of service at the prison, Plaintiff reported only one

3   IEX incident; that following it, the Inmate Patient was found guilty of the charge; that during the

4   incident the Inmate Patient was confined to a cell thus not presenting any physical threat; that the

5   Inmate Patient was disciplined to the fullest extent possible and permanently banned from

6   attending Plaintiff's classes; and that Plaintiff did not experience any further IEX incidents.

7         A reasonable woman, trained as a registered nurse, who chose to work and did work at

8   CMF for over 14 years, would not have reasonably considered her work environment hostile or

9   abusive based on <u>one</u> reported IEX incident. In addressing the severe and pervasive issue in

10  Plaintiff's case, the Court must consider the prison setting. The general rule is that prisons are not

11  liable for inmate misconduct. "Prisoners, by definition, have breached prevailing societal norms

12  in fundamentally corrosive ways. By choosing to work in a prison, corrections personnel have

13  acknowledged and accepted the probability that they will face inappropriate and socially deviant

14  behavior." *Slayton v. Ohio Dept. of Youth Servs.*, 206 F.3d 669, 676 (6th Cir. 2000).  However,

15  the general rule "does not apply when the institution fails to take appropriate steps to remedy or

16  prevent illegal inmate behavior." *Id.*  When analyzing whether or not the environment created by

17  inmate misconduct is sufficiently severe or pervasive, the Court must consider the inmate

18  misconduct in the context of a prison environment. In other words, what amounts to severe or

19  pervasive misconduct in a prison setting is different than what amounts to severe or pervasive

20  misconduct in an office setting.  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81

21  (1998) (court must carefully consider "the social context in which particular behavior occurs and

22  is experienced by its target" when assessing whether a hostile work environment exists).

23        The third element requires consideration of the totality of the circumstances and whether

24  the harassment was both objectively and subjectively abusive. *Meritor Savings Bank v. Vinson*,

25  477 U.S. 57, 66 (1986). Factors to be considered include the severity and frequency of the

26  conduct, whether it is physically threatening or humiliating or merely an offensive utterance, and

27  whether the conduct unreasonably interferes with the employee's work performance.  *Harris v.*

28  *Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Consideration of Plaintiff's expectation of her work

14

1   environment is relevant in determining whether an environment can be considered hostile.  *See*

2   *Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677 (6th Cir. 2000) (by accepting

3   employment in a prison, "corrections personnel have acknowledged and accepted the probability

4   that they will face inappropriate and socially deviant behavior"); *see also Powell v. Morris*, 37 F.

5   Supp. 2d 1011, 1017 (S.D. Ohio 1999) (noting that correctional employees assume risks,

6   including lewd, sexual behavior by inmates.  "[S]evere and pervasive misconduct in a

7   correctional setting is wholly different than what would be reasonably expected within the

8   confines of, for example, a law office."  *Daniels v. CDCR*, No. 2:10-cv-00003-MCE-AC, 2013

9   U.S. Dist. LEXIS 165897, at *7 (E.D. Cal. Nov. 20, 2013).

10       In evaluating the objective hostility of a work environment, the factors to be considered

11   include the "frequency of discriminatory conduct; its severity; whether it is physically threatening

12   or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

13   employee's work performance." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1113-15 (9th Cir.

14   2004) (citations omitted). "The required level of severity or seriousness varies inversely with the

15   pervasiveness or frequency of the conduct." *Id.* (internal quotation marks omitted) (citations

16   omitted).  In this case, the alleged conduct, consisting of one single act of IEX which did not

17   involve any physical contact or verbal interactions, cannot be deemed sufficiently severe or

18   pervasive to alter the conditions of employment and create an abusive work environment.

19       **B.    Prison Liability for Inmate Sexual Harassment**

20       But even if a Plaintiff is able to overcome the initial hurdle of showing a severe and

21   pervasive hostile work environment, a prison can only be liable for harassing conduct by inmates

22   where it "either ratifies or acquiesces in the harassment by not taking immediate and/or corrective

23   action when it knew or should have known of the conduct." *Freitag*, 468 F.3d at 538 (citing

24   *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Liability is

25   "grounded not in the harassing act itself – i.e., inmate misconduct – but rather in the [prison's]

26   'negligence and ratification' of the harassment through its failure to take appropriate and

27   reasonable responsive action." *Freitag*, 468 F.3d at 538 (citing *Galdamez v. Potter*, 415 F.3d

28   1015, 1022 (9th Cir. 2005).

15

1    In this case, it is undisputed that the alleged harassment was caused by a third party, an

2    inmate who is not a party to this litigation, and not by Plaintiff's employer. Plaintiff has not

3    alleged that she was either discouraged by her supervisors from reporting the incident, or else

4    declined to report the incident for fear of retaliation by the Defendants. Similarly, Plaintiff has not

5    alleged that she was retaliated against due to her complaint regarding the IEX incident. Rather,

6    Plaintiff reported the incident to the Defendants and the Defendants took immediate action to

7    correct and prevent other similar incidents. "In recognizing that employers may be liable for

8    third-party conduct, we, along with several other circuits, . . . have relied in part upon a regulation

9    of the Equal Employment Opportunity Commission that provides that employers may be held

10   liable for the acts of non-employees where the employer 'knows or should have known of the

11   conduct and fails to take immediate and appropriate corrective action.' 29 C.F.R. § 1604.11(e).

12   This theory of liability is grounded not in the harassing act itself—i.e., inmate misconduct—but

13   rather in the employer's 'negligence and ratification' of the harassment through its failure to take

14   appropriate and reasonable responsive action .... The third element requires us to consider the

15   totality of the circumstances and whether the harassment was both objectively and subjectively

16   abusive." *Freitag*, 468 F.3d at 538-40 (internal quotations and citations omitted). Accordingly, a

17   prison is not liable if it takes corrective measures "reasonably calculated to end the harassment,"

18   with the issue of reasonableness hinging on the promptness of the prison's response and its ability

19   to stop the harassment. *Freitag,* 468 F.3d at 539-540 citing *Ellison v. Brady,* 924 F.2d 872, 882

20   (9th Cir. 1991).

21   Once Plaintiff reported the IEX Incident, CDCR immediately followed the protocol in place

22   to address IEX incidents at the prison.[4] CDCR conducted an administrative hearing and found the

23   Inmate Patient guilty. As a consequence, the Inmate Patient was disciplined by being placed in

24   administrative segregation, losing a number of benefits including conduct credits, and was

25   required to wear an exposure control jumpsuit for 90 days. Additionally, the Inmate Patient was

26

27   [4] In September 2006, CDCR began work on an Indecent Exposure Incidents and Sexual
     Disorderly Conduct policy, to be implemented in all CDCR adult male institutions statewide.
     This policy is codified in Title 15 of the California Code of Regulations and the Department
28   Operations Manual.

16

also immediately removed from Plaintiff's class and – as requested by Plaintiff – he was banned from attending her class going forward. Finally, CDCR reported the Inmate Patient to the Solano County District Attorney's Office for potential criminal prosecution. In other words, Defendants fully complied with, and followed the applicable protocol in connection with the IEX Incident, and certainly did not ratify or acquiesce in the harassment by not taking immediate and/or corrective action. That Defendants' actions were appropriate under the circumstances is confirmed by the fact that Plaintiff did not experience any further IEX incidents.

The other encounters that Plaintiff had with the Inmate Patient were accidental in nature and, based on Plaintiff's own testimony, unavoidable because CDCR staff and inmates accessing the O-2 building for medical treatment transit through the same hallway, where there can be hundreds of people at once. The Inmate Patient had valid medical reasons for being in the O-2 building because access to it is limited to inmates scheduled to group or individual medical treatment. Also, the Inmate Patient did not commit any acts that amounted to IEX or harassment. Rather, he was simply in the same place at the same time because he had a valid documented reason to be in the O-2 building. Correctional officers are present in the O-2 building at all times, ready to intervene if needed. In either case Plaintiff did not request, and there was no need for, guard intervention because the Inmate Patient did not commit any improper acts while there.

Plaintiff cannot validly assert that Defendants "did nothing" in response to her complaints. The undisputed facts plainly show that Defendants addressed the IEX Incident quickly and according to protocol. Plaintiff specifically requested that the Inmate Patient be removed from her class, and Defendants immediately did so and banned him from attending Plaintiff's class going forward. The subsequent reported encounters simply did not rise to the level of misconduct necessitating corrective action, in fact they do not constitute misconduct. Accordingly, Plaintiff's Title VII claim fails because Plaintiff did not suffer a hostile work environment.

## C.   CDCR's Reasonable Response to Plaintiff's Reports of Inmate Harassment Preclude a Finding That CDCR Fostered a Hostile Work Environment.

As to the question of liability, in the situation where a sexually hostile environment is caused by a third party, "[e]mployers are liable for the actions of nonemployees only when they

17

knew or should have known of the offensive behavior and failed to take immediate and

appropriate action." *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002) (citing

29 C.F.R. § 1604.11(e)). *Freitag* holds that prisons have a legal obligation under Title VII to take

reasonable measures to protect its employees to the extent possible from inmate sexual abuse.

*Freitag*, 468 F.3d at 539. As noted by the *Powell* court, "[t]he most we can expect and require

prisons to do is to implement and enforce policies reasonably calculated to minimize such

harassment and protect the safety of its employees." *Powell*, 37 F. Supp. 2d at 1017. The *Freitag*

court acknowledged that "it would have been reasonable for Freitag to anticipate substantial

inmate misbehavior, given the severity of the crimes committed by those incarcerated at Pelican

Bay," but that she also "had reason to expect that prison officials would seek in good faith to

control the most extreme forms of sexual misconduct." *Freitag*, 468 F.3d at 540 (citing *Slayton*,

206 F.3d at 677).

In determining the "appropriateness" of an employer's response, no bright-line rule exists.

*Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244-1245 (10th Cir. 2001). Rather, the inquiry

should be whether the response was "reasonable under the circumstances." *Id*. at 1245. "Key

factors in that determination are the promptness and effectiveness of any action." *Id*. However,

because it is not possible in every instance to completely eliminate offensive behavior, the

effectiveness inquiry should look, "not to whether offensive behavior actually ceased but to

whether the remedial and preventative action was reasonably calculated to end the harassment."

*Id*.

Penal Code § 314 prohibits acts of indecent exposure, with a first conviction punishable as

a misdemeanor and a subsequent conviction as a felony. Inmates are also prohibited from

participating in illegal sexual acts. Cal. Code Regs., tit.15, §§ 3001, 3007. Indecent exposure is a

serious rules violation and inmates who are found guilty in a disciplinary hearing can lose

privileges. Cal. Code Regs., tit. 15, §§ 3312, subd. (a)(3), and 3315, subds. (a)(1) and (f)(5)(K).

Inmates can also be assessed a "good behavior" credit loss dependent upon their criminal

conviction history. Cal. Code Regs., tit. 15, §§ 3323, subd. (d)(9), and 3323, subd. (f)(5). CDCR

considers indecent exposure by inmates as criminal misconduct and refers such incidents for

18

1    possible prosecution to the local District Attorney's office. Cal. Code Regs., tit. 15, § 3316;

2    CDCR's Department Operations Manual, § 52100.4 (Exhibit G to Abbasciano Decl.)

3         In accordance with these rules, CDCR took the incident seriously and the Inmate Patient

4    was found guilty and disciplined. After Plaintiff reported the Inmate Patient's IEX, the Inmate

5    Patient was set for a disciplinary hearing on March 12, 2018. After assignment of an investigating

6    officer, review of the disciplinary reports, and the testimony of witnesses and the Inmate Patient,[5]

7    the Senior Hearing Officer found sufficient evidence to find the Inmate Patient "guilty to the

8    charge of IEX without prior convictions for PC 314 a Division "D" offense which is in violation

9    of CCR Section 3007 wherein this act is prohibited" (Exhibit D to Abbasciano Decl.) The Inmate

10   Patient was disciplined by losing a number of privileges for 90 days, credits, being prohibited

11   yard access for 10 days, and being required to wear an exposure control jumpsuit for 90 days

12   (Exhibit D to Abbasciano Decl.) Additionally, placards were placed in his cell windows limiting

13   the Inmate Patient's view of staff for 90 days. (Exhibit D to Abbasciano Decl.) Finally, the case

14   was referred to the Solano County District Attorney for criminal prosecution. Plaintiff did not

15   report any subsequent IEX incidents concerning the Inmate or any other inmates. It is evident that

16   CDCR took immediate and reasonable measures to protect Plaintiff to the extent it could from the

17   incidents occurring during the limitations period. *Freitag*, 468 F.3d at 539. In fact, Plaintiff was

18   not subjected to any further IEX by the Inmate after the IEX Incident. The subsequent encounters

19   consisted simply of unavoidable situations where Plaintiff and the Inmate Patient crossed paths in

20   the O-2 building, which is used for inmates' medical treatment, and one apparently polite request

21   from the Inmate Patient to rejoin the group. At no time during those encounters did the Inmate

22   commit IEX or other actions requiring discipline. Plaintiff understood the environment she

23   worked in at CMF was dangerous, and that particular inmates with mental health issues would

24   constantly subject both male and female employees to IEX. In particular, Plaintiff admitted that

25   she was aware that the Inmate Patient had been identified as an IEX inmate prior to the incident

26

27        [5] As noted, the Inmate admitted that "I messed up. I'm seeking help by attending the
program the board recommended to help me with this issue." The assessing clinician indicated

28   that the Inmate's mental disorder did contribute to the behavior at the time of the offense (See
Exhibit D to Abbasciano Decl., CDCR-000483)

19

1  (Exhibit C to Abbasciano Decl.) Considering the environment Plaintiff worked in, and CDCR's

2  response to the IEX incident she reported, Plaintiff cannot establish either a hostile work

3  environment or the CDCR's liability under Title VII.

**III.     PLAINTIFF'S STATE-LAW CLAIMS FAILS AGAINST THE DEFENDANTS.**

    **A.     Plaintiff Cannot Assert Common-Law Claims Against The Defendants, Because Public Entities Can Only Be Sued For Statutory Claims.**

7      The Government Claims Act (§ 810 et seq.) establishes the limits of common-law liability

8  for public entities, stating: "Except as otherwise provided by statute: [¶] (a) A public entity is not

9  liable for an injury, whether such injury arises out of an act or omission of the public entity or a

10  public employee or any other person." (§ 815, subd. (a), italics added.) The Legislative

11  Committee Comment to section 815 states: "This section abolishes all common law or judicially

12  declared forms of liability for public entities, except for such liability as may be required by the

13  state or federal constitution, e.g., inverse condemnation...." (Legis. Com. com., 32 West's Ann.

14  Gov.Code (1995), foll. § 815, p. 167, italics added.) Moreover, our own decisions confirm that

15  section 815 abolishes common law tort liability for public entities. (See *Eastburn v. Regional Fire*

16  *Protection Authority* (2003) 31 Cal.4th 1175, 1179; *Zelig v. County of Los Angeles* (2002) 27

17  Cal.4th 1112, 1127–1128; see also *Adkins v. State of California* (1996) 50 Cal.App.4th 1802,

18  1817–1818; *Michael J. v. Los Angeles County Dept. of Adoptions* (1988) 201 Cal.App.3d 859,

19  866–867.) *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 899.)

20      Accordingly, the Court should grant Defendants' Motion for Summary Judgment because

21  Plaintiff cannot assert claims for intentional or negligent infliction of emotional distress against

22  the Defendants as a matter of law.

    **B.     The Workers' Compensation Act Preempts Plaintiffs' State-Law Claims.**

24      "California's Workers' Compensation Act provides an employee's exclusive remedy against

25  his or her employer for injuries arising out of and in the course of employment." *Wright v. State*

26  (2015) 233 Cal.App.4th 1218, 1229 (citation omitted); accord Cal. Lab. Code § 3602(a). The Act

27  preempts claims based on physical or emotional injuries sustained in the course of employment.

28  *Yau v. Santa Margarita Ford, Inc.* (2014) 229 Cal.App.4th 144, 161. Claims for intentional

20

1  infliction of emotional distress are not excluded. *Id*. These claims "fall [...] within the exclusive

2  province of workers' compensation" so long as the conduct "occurred 'at the worksite, in the

3  normal course of the employer-employee relationship.'" *Id*. at 162, 176 Cal.Rptr.3d 824 (quoting

4  *Miklosy v. Regents of Univ. of Cal.* (2008) 44 Cal.4th 876, 902); see also *Langevin v. Fed. Exp.*

5  *Corp.*, No. CV 14-08105 MMM FFMX, 2015 WL 1006367, at *8 (C.D. Cal. Mar. 6, 2015)

6  ("Under California law, workers' compensation provides the exclusive remedy for an intentional

7  infliction of emotional distress claim that is based solely on alleged personnel activity."). *Erhart*

8  *v. BofI Holding, Inc.* (S.D. Cal. 2017) 269 F.Supp.3d 1059, 1080–1081.

9      There is no question that Plaintiff's claims arise from the inherent occupational hazard of

10  caring for mentally ill inmates. In *Gregory v. Cott* (2014) 59 Cal.4th 996, 999, 1011, 1015, the

11  California Supreme Court denied a certified nurse assistant's claims arising from an assault by an

12  Alzheimer patient. The Court held that the plaintiff "placed herself in a position where she

13  assumed the duty to take care of [Alzheimer] patients who were potentially violent and to protect

14  such patients from committing acts which might injure others." (*Id*. at p. 1004.) Here, Plaintiff's

15  work in the psychiatric unit of CMF was to ensure that mentally ill inmates would receive proper

16  treatment. Unfortunately, like the Alzheimer patient in Gregory, inmates – especially mentally ill

17  inmates – can be unpredictable and injure caregivers. Plaintiff is a medical professional and

18  understood that caring for mentally ill inmates would be challenging. The sexual harassment she

19  witnessed was just an inherent aspect of the Plaintiff's duty to care for mentally ill inmates. If she

20  suffered any injuries, Plaintiff's recourse is through workers' compensation. (See *Gregory*, supra,

21  59 Cal.4th at pp. 1002 [noting that "as a matter of fairness," a worker hired to handle a dangerous

22  situation "should not be heard to complain of the negligence that is the cause of [...] her

23  employment"], 1015 [stating that "[a]fter weighing the public policies involved, we agree with

24  those sister-state jurisdictions which have concluded that workers' compensation, rather than tort

25  recovery, is the appropriate means of compensating hired caregivers for injuries caused by

26  Alzheimer's patients"].) Accordingly, because of the inherent risk of caring for medically ill

27  inmate patients, Plaintiff's third-party harassment claims, which are based on negligence, are

28  preempted by the Workers' Compensation Act and fail as a matter of law.

21

**C.      Plaintiff's Common-Law Claims Fail on the Merits Because Defendants'
Actions Were Not Outrageous, and Plaintiff Cannot Show Either Bad
Intent or Negligence on the Defendants' Part.**

In addition, Plaintiff's common-law claims also fail on the merits.

### i. Intentional Infliction of Emotional Distress.

Assuming, *arguendo*, that Plaintiff could bring a common-law claim for intentional

infliction of emotional distress against the Defendants, Plaintiff would not meet the elements of a

*prima facie* case. In particular, to prevail Plaintiff must establish the following elements:

"(i) outrageous conduct by defendant, (ii) an intention by defendant to cause, or reckless

disregard of the probability of causing, emotional distress, (iii) severe emotional distress, and

(iv) an actual and proximate causal link between the tortious conduct and the emotional

distress." *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 300, 763 P.2d 948, 961 (1988).

Plaintiff cannot show that the Defendants' conduct was outrageous. A defendant's conduct

is considered to be outrageous if "it is so ' " 'extreme as to exceed all bounds of that usually

tolerated in a civilized community.' " ' " (*Hughes v. Pair* (2009) 46 Cal.4th 1051; see *Potter v.

Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1001; see also Rest.2d Torts, § 46, com. d, p.

73.) California's definition of extreme and outrageous conduct is based on comment d to section

46 of the Restatement Second of Torts. (See *Hughes v. Pair, supra*, 46 Cal.4th at p. 1051.)

Comment d to section 46 states: "Liability has been found only where the conduct has been so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Generally, the case is one in which the recitation of the facts to an average member of the

community would arouse his resentment against the actor, and lead him to exclaim,

'Outrageous!'" (Rest.2d Torts, § 46, com. d, p. 73.)

Moreover, Defendants took every step pursuant to applicable protocols and policies to

immediately address Plaintiff's complaint. Plaintiff indicated that CDCR followed departmental

policy concerning inmate sexual misconduct (Exhibit C to Abbasciano Decl.) Plaintiff was

provided with documents and information showing that Defendants conducted a disciplinary

hearing regarding Plaintiff's allegations and complaints, the Inmate was disciplined accordingly,

22

1   and – as requested by Plaintiff – he was permanently banned from attending Plaintiff's group

2   classes. Furthermore, Defendants reported the matter to the Solano County District Attorney's

3   Office for criminal prosecution of the Inmate.

4        Plaintiff' contention that Defendants' failure to act in response to her claims shows an

5   improper motive, besides being untrue, is also not the legal standard for a *prima facie* claim for

6   intentional infliction of emotional distress. Plaintiff must establish that the defendant *intended* to

7   cause or acted with a reckless disregard of the probability of causing emotional distress. See

8   *Miller v. Nat'l Broadcasting Co*. (1986) 187 Cal.App.3d 1463, 1487 (holding that defendant's

9   unauthorized broadcast of sensitive, private matters was sufficient showing of reckless disregard).

10  The defendant must act either with the intent to inflict injury or with the realization that injury

11  will result. See *Id*. Where there is no intent to inflict emotional distress, the defendant is entitled

12  to judgment. See *Moore v. Greene*, 431 F.2d 584, 590 n. 3 (9th Cir. 1970). *Dove v. PNS Stores,*

13  *Inc.* (C.D. Cal. 1997) 982 F.Supp. 1420, 1425. At no point has Plaintiff alleged that Defendants

14  <u>intentionally</u> caused emotional distress to her by – for instance – placing the Inmate Patient in her

15  classroom so that he would commit IEX in front of Plaintiff and cause her emotional distress.

16              **ii. Negligent Infliction of Emotional Distress.**

17       Similarly, Plaintiff does not meet the elements of a *prima facie* case of negligent infliction

18  of emotional distress. In particular, to prevail Plaintiff would have to show "(1) that Defendant

19  owed Plaintiff a duty, (2) which Defendant breached, (3) the breach of which was an actual and

20  proximate cause of (4) Plaintiff's damages." *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1262–63

21  (N.D. Cal. 2014). Plaintiff cannot meet this standard. In particular, Plaintiff will not be able to

22  prove that the Defendants breached their duty to her. The Supreme Court of California explained

23  that there is no independent tort of negligent infliction of emotional distress *Potter v. Firestone*

24  *Tire & Rubber Co*. (1993) 6 Cal.4th 965, 984. The tort is negligence, a cause of action in which a

25  duty to the plaintiff is an essential element. That duty may be imposed by law, be assumed by the

26  defendant, or exist by virtue of a special relationship. Unless the defendant has assumed a duty to

27  plaintiff in which the emotional condition of the plaintiff is an object, recovery is available only if

28  the emotional distress arises out of the defendant's breach of some other legal duty and the

23

1   emotional distress is proximately caused by that breach of duty. *Id. Chaconas v. JP Morgan*

2   *Chase Bank* (S.D. Cal. 2010) 713 F.Supp.2d 1180, 1187. Therefore, Plaintiff must either allege a

3   duty owed to her regarding her emotional condition or allege that her emotional distress arises out

4   of Defendants' breach of some other legal duty. Here, Plaintiff alleges that the negligent infliction

5   of emotional distress is a consequence of the hostile work environment created by the Defendants.

6   However, Plaintiff's hostile-work-environment claim fails because the Defendants' response was

7   reasonable under the circumstances and prevented further IEX by the Inmate Patient. CDCR took

8   reasonable measures to protect Plaintiff to the extent it could from the Inmate's sexual abuse by

9   holding him accountable for his misconduct. *Freitag*, 468 F.3d at 539-540.

10   **IV.   APPLICABLE STATUTES OF LIMITATIONS**

11           Finally, Plaintiff's claims, in addition to failing on the merits, are also time barred.

12           **A. Plaintiff's Title VII action is time barred**

13           Before bringing a Title VII action in federal court, a plaintiff must first exhaust

14   administrative remedies by filing a timely charge with the Equal Employment Opportunity

15   Commission (EEOC). 42 U.S.C. § 2000e–5(b); see *Lyons v. England*, 307 F.3d 1092, 1103-04

16   (9th Cir. 2002); *Sommantino v. United States*, 255 F.3d 704, 707 (9th Cir. 2001); *EEOC. v.*

17   *Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir.1994). This charge must be filed within 180 days of

18   the last discriminatory act (or within 300 days in a state, such as California, which has its own

19   anti-discrimination laws and agency, and where the aggrieved employee has instituted

20   proceedings with a state or local agency). 42 U.S.C. § 2000e–5(e)(1). The district court complaint

21   must be filed within 90 days of receipt of a Right–to–Sue Letter from the EEOC. 42 U.S.C. §

22   2000e–5(f) (1). The scope of the district court's jurisdiction is limited by the allegations contained

23   in the EEOC charge and the EEOC investigation. *Farmer Bros. Co.*, 31 F.3d at 899. The timing

24   requirements are subject to waiver, estoppel, and equitable tolling.  *Zipes v. Trans World Airlines*,

25   455 U.S. 385, 398 (1982) In the complaint, Plaintiff indicates that the right-to-sue letter was

26   issued by the EEOC on August 13, 2020 [Dkt. No. 1.] Plaintiff filed her complaint on November

27   12, 2020, i.e. **91 days** after the right-to-sue letter was issued. Accordingly, Plaintiff's complaint

28   was untimely filed and is therefore time barred.

**B. Plaintiff's state-law claims are time barred.**

Plaintiff's state-law claims are subject to a two-year statute of limitations, and therefore they are also time barred. Federal courts apply the state's personal injury statute of limitations, subject to any state tolling provisions that are not inconsistent with federal law. *Wallace v. Kato*, 549 U.S. 384, 387 (2007). As noted above, Plaintiff filed suit on November 12, 2020. [Dkt. No. 1.] Thus her claims occurring prior to November 12, 2018, are barred by the statute of limitations based on the two-year limitations period.[6] The only encounter with the Inmate Patient that occurred after November 12, 2018 consisted in the inmate temporarily entering Plaintiff's classroom and asking whether he could attend the group session. Plaintiff ordered him to leave, which he did, and Plaintiff did not feel the need to call the prison guards. Plaintiff did not report that the Inmate Patient acted with discourtesy or in an aggressive or threatening fashion.

Accordingly, the Court should grant Defendants' Motion for Summary Judgment because Plaintiff's claims are time barred.

## CONCLUSION

Given the foregoing, this Court should find that there is no genuine dispute as to any material fact on any of Plaintiff's claims against the Defendants, and that Defendants are entitled to summary judgment.

Dated:  November 19, 2021                    Respectfully submitted,

ROB BONTA
Attorney General of California
MIGUEL A. NERI
Supervising Deputy Attorney General

*/s/Stefano Abbasciano*

STEFANO ABBASCIANO
Deputy Attorney General
*Attorneys for California Department of
Corrections and Rehabilitation; California
Medical Facility*

OK2020900506/91437390.docx

---

[6] As of January 1, 2003, the California statute of limitations for personal injury actions, including intentional and negligent infliction of emotional distress, is two years.  Cal. Code Civ. Proc. § 335.1; *Maldonado v. Harris*, 370 F.3d 945, 954–55 (9th Cir. 2004).

25