UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA C. LUNA,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, et al.,<br><br>　　　　　Defendants. | Case No.  20-cv-08097-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 30 |

## I.　　**INTRODUCTION**

Plaintiff Maria Luna brought an employment discrimination suit against Defendants the California Department of Corrections and Rehabilitation ("CDCR") and the California Medical Facility in Vacaville ("CMF").  Plaintiff claims that, while working as a registered nurse at CMF, she experienced an indecent exposure incident (the "IEX") and several other occasions which she perceived as threats by an inmate patient (the "offending inmate" or "inmate patient").  Plaintiff claims that she suffered physical and emotional injuries as a result of the repeated encounters and Defendants failed to provide accommodations she requested to eliminate her exposure to the offending inmate.  Plaintiff thereafter brought a Title VII hostile work environment claim and state law tort claims.

The Court heard Defendants' motion for summary judgment on April 14, 2022.  *See* Defendants' Motion for Summary Judgment ("MSJ"); Docket No. 30.  Having considered the parties' briefs and arguments presented at the hearing, the Court hereby **GRANTS** Defendants' motion.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

## II.      FACTUAL & PROCEDURAL BACKGROUND

A.      Background

Plaintiff initially filed charges with the Federal Equal Employment Opportunity Commission ("EEOC") in September 2018 and obtained a Right-to-Sue letter on August 13, 2020. *See* Complaint ¶¶ 8-9; Docket No. 1.  She filed this suit on November 12, 2020.  *See* Complaint. In her original complaint, she alleges employment discrimination under Title VII, specifically for "repetitive exposure to intimidating and hostile work environment" and "intentional/negligence infliction of emotional distress due to hostile work environment."  *See* Complaint ¶ 5.

Plaintiff is a Filipino-American registered nurse and has been an employee of Defendants since 2004.  Opposition ("Opp'n") at 1; Docket No. 45.  During her time working at CMF, Plaintiff has not encountered other incidents similar to the ones underlying this case.  Opp'n at 1. Plaintiff started working with the mental health unit at CMF around 2016 or 2017, and her duties as an instructor include educating inmates regarding subjects on mental and medical health issues and assessing inmates' medical concerns.  Plaintiff's Deposition, Exhibit A to the Declaration of Stefano Abbasciano ("Plaintiff's Deposition") at 12:18-24; 14:10-14.  When an inmate patient does not act appropriately, such as by disrupting a session, Plaintiff deals with the problem right away before it escalates and calls an officer only if the inmate patient refuses to leave as instructed.  Plaintiff's Deposition at 114:9-21.

According to Plaintiff, she works at the mental health unit because it is the only one that fits her schedule, is close to her house, and is convenient for her to attend to family needs. Plaintiff's Deposition at 24:16-19; 79:20-80:1.

B.      The IEX Incident

On February 9, 2018, while conducting a group class at work, the offending inmate "engaged in threatening behavior towards Plaintiff by exposing himself and masturbating while staring."  Opp'n at 1; Declaration of Maria C. Luna ("Luna Decl.") at ¶¶ 2, 3.  According to Plaintiff, the inmate did not assault, approach, or touch her; Plaintiff escaped the classroom right away and saw guards on duty outside.  Plaintiff's Deposition at 27:15-23; 29:5-17.  While attempting to run out of the classroom, Plaintiff reinjured her left ankle, which she had previously

2

injured at work.  Plaintiff's Deposition at 27:8-13.  Plaintiff then ordered the inmate to step out of the room, and guards handcuffed him and put him under temporary isolation.  Plaintiff's Deposition at 28:1-9.  Plaintiff later filed reports of the IEX incident to her supervisors and officers on duty.  Luna Decl. at ¶ 4.

C.    Prior Encounters with the Inmate

The inmate at issue had a history of IEX incidents and other rule violations involving violence prior to the February 9 IEX incident.  *See* Exhibit 2 to the Declaration of Steven N. Williams ("Williams Decl."), Freeman at 63:14-19; Exhibit D to MSJ at 111-114.  Plaintiff recalls that, prior to the February 9 incident, that inmate could have been attending her group class for over a year ("I think I had him attending my class—it could be more than a year."), and she had not had any safety concerns regarding the inmate's presence in her classroom.  Plaintiff's Deposition at 31:10-24; 34:23-35:1.  The inmate once told Plaintiff when they were alone together during one of her classes that he was in prison for murdering another Asian woman and that he hit her head with a big rock and left her dying on the ground.  Luna Decl. at ¶ 5.  Plaintiff states that she "didn't take that like a threat or what because some—some inmates do tell their stories."  Plaintiff's Deposition at 56:1-15.

D.    Subsequent Encounters with the Inmate

On October 12, 2018, Plaintiff noticed the offending inmate "staring at her through the classroom window when she was working in her classroom."  Opp'n at 2.  "Plaintiff was so frightened during this episode that she could not look at the inmate, even while he stood staring at her."  Opp'n at 2; Luna Decl. at ¶ 7.  Defendants claim that inmates usually stay in the hallway and are visible from the classroom while they wait for a doctor appointment or a group class.

On October 22, 2018, Plaintiff encountered the inmate in the O wing hallway, and he "moved and walked towards the center of the hallway" where Plaintiff was.  Opp'n at 2; Luna Decl. at ¶ 8. Defendants suggest that when Plaintiff saw the inmate in the hallway, she stopped to talk to janitorial staff to allow the inmate to continue walking, and the inmate was gone when she finished her conversation.  Plaintiff's Deposition, at 46:10-47:15.

On October 26, 2018, Plaintiff submitted a CDC 128-B form[1] to the Custody and Nursing Supervisor stating her safety concerns.  Opp'n at 3.  Plaintiff claims that "Defendants failed to notify Plaintiff of the outcome of the reported stalking incident" and "Defendants could not identify any current staff member who may have reviewed" the 128-B form.  Opp'n at 3.

Defendants note that, for both encounters in October, "there was no interaction, verbal communication, or physical contact between Plaintiff and the inmate" and "no guard intervention was required."  Plaintiff's Deposition, at 52:10-20; 55:1-14; 73:5-74:2; 77:12-23.

On November 29, 2018, the inmate entered Plaintiff's classroom unannounced and without cause.  The shock of this encounter "caused her severe trauma, chest pain, and hand tremors."  Opp'n at 3; Luna Decl. at ¶ 9.  The inmate confronted Plaintiff while standing approximately five feet away from her; this incident left her distraught and she was sent home by the Nursing Supervisor due to her emotional distress.  Opp'n at 3.  Defendants note that the inmate was in Plaintiff's classroom to ask if he could join her class, and he left after the second time she ordered him to step out of the room.  Plaintiff's Deposition, at 74:10-76:2.

A doctor's note dated December 13, 2018 writes:  "On a psychological basis, Maria Luna is restricted from working in the same building with the inmate that sexually threatened her."  Exhibit 6 to Williams Decl. ("Physician's Notes").  Similar notes were issued several times from February to November.  Plaintiff's last day at work was December 12, 2018, after which she went on workers' compensation.  Plaintiff's Deposition, at 81:13-23.

E.    Plaintiff's Requests and Defendants' Responses

Plaintiff appears to have made several requests to Defendants on different occasions following the IEX incident and the subsequent encounters.  Specifically:

(1) Segregation, disciplinary action, and prosecution

Plaintiff appears to have expected that "[w]hen an inmate commits the act of indecent

---

[1] According to the California Code of Regulations, "General Chrono means a CDC Form 128-B (Rev. 4-74) which is used to document information about inmates and inmate behavior."  Cal. Code Regs. tit. 15 § 3000.  "Such information may include, but is not limited to, documentation of enemies, records of disciplinary or classification matters, pay reductions or inability to satisfactorily perform a job, refusal to comply with grooming standards, removal from a program, records of parole or social service matters."  *Id.*

1    exposure, he is supposed to be removed from the general population and placed in administrative

2    segregation pending an outcome of the institutional classification committee.  Following this, a

3    CDCR-115 rules violation report is issued, and the incident is referred to the local district

4    attorney's office for felony prosecution."  Opp'n at 6.

5            (2) Zero exposure and alternative work opportunities

6            Plaintiff "asked for alternate work with zero exposure to the same inmate."  Further Case

7    Management Conference Statement ("CMC Statement") at 3; Docket No. 22; *see also* Opp'n at 5

8    ("At no point during her employment was Plaintiff offered alternate accommodations or given

9    duties that kept her physically away from the offending inmate's vicinity.").  Plaintiff appears to

10   suggest that "at the bare minimum, [Defendants should] volunteer a determination of any other

11   employment opportunities for Plaintiff."  Opp'n at 6.

12           (3) Compliance with CDCR/CMF's policies

13           Plaintiff asserts that "Defendants failed to take prompt, appropriate and reasonable

14   responsive action in implementing and enforcing CDCR/CMF's policies and procedures such as

15   those provided by the 'Assessment of Threats Against Staff' and 'Inmate Sexual Misconduct

16   Reduction Plans.'"  CMC Statement at 4-5.

17           (4) Handling of the CDC 128-B form

18           Plaintiff seems to have expected that Defendants notify her of the "outcome of the reported

19   stalking incident or that any measures were taken to address her safety concerns [specified in a

20   CDC 128-B form she submitted to the Custody and Nursing Supervisor]."  Luna Opp'n at 2.

21           (5) Accommodations relating to permanent restrictions

22           Plaintiff claims that "Defendants, and particularly the Disability Management Unit, is

23   responsible for ensuring there is discussion with Plaintiff concerning the permanent restrictions,

24   her interests in pursuing employment, and whether she wishes to maintain employment within the

25   agency.  Despite a determination that the restrictions were permanent in November last year, such

26   a discussion has not happened till date."  Opp'n at 7.

27           (6) Other accommodations

28           Plaintiff claims that it is possible for the inmate to receive his treatment and also avoid

United States District Court
Northern District of California

5

1   crossing paths with Plaintiff.  Opp'n at 7.  For example, "per recent testimony, it is determined

2   possible to use walkie-talkies and at the very least, intimate Plaintiff if the offending inmate is in

3   the hallway."  Opp'n at 7 (citing Exhibit 2 to Williams Decl., Freeman at 34:14-22).  "Another

4   possible option would have been banning the offending inmate from Plaintiff's classrooms, but

5   this was also apparently not considered by Defendant."  Opp'n at 7 (citing Exhibit 1 to Williams

6   Decl., Moeckly at 66:14-24[2]).

7        Overall Plaintiff claims that there is no evidence that Defendants took any action

8   whatsoever in response to her request for accommodation.  Opp'n at 2.  She also claims that "there

9   is no evidence that the offending inmate was even banned from Plaintiff's classrooms."  Opp'n at

10   2.

11        Defendants contends that, as Plaintiff requested, CDCR permanently banned the Inmate

12   Patient from attending Plaintiff's group classes.  MSJ at 7; Exhibit C to Abbasciano Decl. ISO

13   MSJ; Docket No. 30-1; Plaintiff's Deposition, at 31:10-16; 38:13-17; 44:24-45:6.  Defendants

14   claim that they took the maximum actions allowed in an effort to discourage and punish the

15   inmate.  MSJ at 7.  Specifically, the Inmate Patient was found guilty of the charge, disciplined to

16   the maximum extent allowed in CMF's disciplinary system,[3] and referred to the local Solano

17   County District Attorney for prosecution.  Exhibit D to Abbasciano Decl. ISO MSJ.

18        Defendants pointed out that Plaintiff acknowledged that CDCR followed the departmental

19   policy concerning inmate sexual misconduct.  Exhibit C to Abbasciano Decl. ISO MSJ (On a

20

21   _____

    [2]

22        Q:  "So what you're telling me is that this (banning a subject inmate
          from a classroom) is an option that is available to them, but you

23        really have no idea when they use this option and when they don't?"
          Ds' attorney:  "Objection; misstates his testimony."

24        A:  "Correct.  Yeah, I don't have any knowledge of when is has
          been used."

25        Q:  "Okay."

26   [3] Inmate was found "guilty to the charge of IEX without prior convictions for PC 314 a Division D
     offense which is in violation of CCR Section 3007 wherein this act is prohibited"  Disciplinary

27   actions include losing a number of privileges for 90 days, losing credits, being prohibited yard
     access for 10 days, being required to wear an exposure control jumpsuit for 90 days, and having

28   placards placed in his cell windows to limit his view of staff for 90 days.  *See* MSJ at 19; Exhibit
     D to Abbasciano Decl.

*United States District Court*
*Northern District of California*

1   "Employee Report of sexual Misconduct" form dated "02/09/18" and signed by the Plaintiff,

2   answer "Yes" was circled for both the question "Was departmental policy concerning inmate

3   sexual misconduct followed?" and the question "Was Sexual Misconduct Reduction policy

4   discussed with reporting employee?").

### III.    LEGAL STANDARD

#### A.    Motion for Summary Judgment (Rule 56)

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.[4]

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

#### B.    Hostile Work Environment

To bring a successful Title VII claim under the hostile work environment theory, the employee must establish (1) the existence of a hostile work environment to which the plaintiff was subjected, and (2) that the employer is liable for the harassment that caused the hostile environment to exist.  *Freitag v. Ayers,* 468 F.3d 528, 539 (9th Cir. 2006).  A hostile work

---

[4] Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

environment is one where (1) the plaintiff was subjected to verbal or physical conduct of a harassing nature, (2) this conduct was unwelcomed, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1110 (9th Cir. 2000). "The third element requires us to consider the totality of the circumstances and whether the harassment was both objectively and subjectively abusive." *Freitag,* 468 F.3d at 539. "Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Kortan,* 217 F.3d at 1110 (citing *Faragher v. City of Boca Raton,* 118 S.Ct. 2275, 2283 (1998) (internal citation and quotations marks omitted).

Employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Freitag,* 468 F.3d at 538. "The CDCR is not, by simple virtue of its status as a correctional institution, immune under Title VII from a legal obligation to take such measures and to protect its employees to the extent possible from inmate sexual abuse." *Id.* at 539.

## IV.   **DISCUSSION**

Defendants argue that summary judgment is proper because (1) Plaintiff's Title VII claim fails on the merits as she cannot prove a hostile work environment or Defendants' failure to take reasonable action under the circumstances, (2) Plaintiff cannot assert her common law claims because public entities can only be sued for statutory claims, (3) the Workers' Compensation Act preempts Plaintiff's state law claims, and (4) Plaintiff's common law claims fail on the merits because she cannot establish outrageous conduct by Defendants or their bad intent or negligence. *See* MSJ at 12. Defendants in their reply to Plaintiff's opposition withdraws their argument that Plaintiff's Title VII claim is time-barred, but still assert that the state law claims are timed-barred. Reply at 7; Docket No. 45.

A.      <u>Title VII Claim</u>

To show a hostile work environment, Plaintiff must show verbal or physical harassment that was unwelcomed and the severity or pervasiveness of the harassment was sufficient enough to "alter the conditions of [her] employment and create an abusive working environment." *Kortan,* 217 F.3d at 1110. "A single incident of harassment can support a claim of hostile work environment because the frequency of the discriminatory conduct is only one factor in the analysis . . . but for a single incident to suffice, it must be extremely severe." *Fried v. Wynn Las Vegas, LLC,* 18 F.4th 643, 648 (9th Cir. 2021) (citing *Little v. Windermere Relocation, Inc.,* 301 F.3d 958, 967 (9th Cir. 2002); *Brooks v. City of San Mateo,* 229 F.3d 917, 926 (9th Cir. 2000)) (internal quotations marks omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *Faragher,* 118 S. Ct. at 2283 (internal citations and quotation marks omitted). "When severity is questionable, "it is more appropriate to leave the assessment to the factfinder than for the court to decide the case on summary judgment." *Fried,* 18 F.4th at 648 (citing *Davis v. Team Elec. Co.,* 520 F.3d 1080, 1096 (9th Cir. 2008)).

Once the court finds hostile work environment, Defendants' liability hinges on their responses to the inmate's conduct—specifically, whether the responses were prompt, reasonable, and effective. *See Freitag,* 468 F.3d at 539-40 ("With respect to the question of liability for harassment caused by a third party, the employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, inter alia, the employer's ability to stop the harassment and the promptness of the response.") (internal citation omitted).

1.      <u>Hostile Work Environment</u>

The Court first determines whether the inmate's conduct was sufficiently severe or pervasive. The Ninth Circuit has held that "[i]n evaluating the severity and pervasiveness of sexual harassment, we should focus on the perspective of the victim." *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991) ("[B]ecause women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual behavior. Women who are

victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault.").

The court must also determine the objective abusiveness of the environment.  In making such objective evaluation, the Court can look to the frequency of the encounters and the nature of actions in which the inmate and Plaintiff engaged.  *See Freitag,* 468 F.3d at 539; *Kortan,* 217 F.3d at 1110; *Brooks,* 229 F.3d at 924 (The Ninth Circuit recognized that "the incident pervaded [the plaintiff's] work environment to such a degree that she required psychological help and even then was unable to successfully return to her job.  She has alleged sufficient facts to support the subjective portion of her hostile work environment claim.  The question remains whether her apprehension was objectively reasonable.").

In "consider[ing] the totality of the circumstances and whether the harassment was both objectively and subjectively abusive," it is proper to take into account the prison setting, Plaintiff's experience and expectation, and the nature of the offensive conducts at issue.  *See Daniels v. CDCR,* No. 2:10-cv-00003-MCE-AC, 2013 U.S. Dist. LEXIS 165897, at *7 (E.D. Cal. Nov. 20, 2013) ("[T]he fact remains that whether or not a sexually charged atmosphere created by inmate behavior is sufficiently severe and pervasive must necessarily be viewed in the context of a prison environment itself . . . what amounts to severe and pervasive misconduct in a correctional setting is wholly different than what would be reasonably expected within the confines of, for example, a law office."); *Slayton v. Ohio Dept. of Youth Servs.,* 206 F.3d 669, 677 (6th Cir. 2000) ("[p]risoners, by definition, have breached prevailing societal norms in fundamentally corrosive ways.  By choosing to work in a prison, corrections personnel have acknowledged and accepted the probability they will face inappropriate and socially deviant behavior.") (internal citations omitted); *Powell v. Morris,* 37 F. Supp. 2d 1011, 1017 (S.D. Ohio 1999) ("The propensity of courts to decline imposing liability for prisoner acts is based on solid logical and practical foundations: anyone who works at a prison, particularly in a position with frequent inmate contact, must expect some off-color interactions.").  As the Supreme Court noted:

> We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the

circumstances."  In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.  A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. *The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.*

*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81–82 (1998) (emphasis added) (internal citation omitted).

Defendants note that Plaintiff has been a trained nurse with over 14 years of experience working in the prison, an extremely stressful environment.  *See* MSJ at 14.  Defendants therefore argue that a person with Plaintiff's experience and similar expectations would not have reasonably considered her work environment hostile or abusive based on only *one* reported IEX incident in over a decade.  *See* MSJ at 14.

Regarding the issue that the inmate told Plaintiff he was in prison for murdering an Asian woman, Defendants note that this allegation has no connection to Plaintiff's alleged emotional distress because, in her deposition, Plaintiff acknowledged that she never had any safety concerns regarding the inmate prior to the IEX incident.  Reply at 8; Plaintiff's Deposition, at 34:23-35:1.

Defendants also argue that one single reported incident of IEX cannot be deemed sufficiently severe or pervasive when considering the "frequency" of the conduct, the level of physical threat, and its interference with Plaintiff's work performance.  *See Kortan,* 217 F.3d at 1110; *McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1113-15 (9th Cir. 2004); *see also Faragher,* 118 S. Ct. at 2283 (Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.) (internal citations and quotation marks omitted).

Plaintiff agrees that the factors listed in *Kortan* and *McGinest* provide a useful guide for evaluating a work environment's objective hostility, but contends that there have been at least three more incidents, including the inmate's "stalking outside Plaintiff's classroom and his contrived and intimidating entry into her classroom," where the offending inmate caused Plaintiff

United States District Court
Northern District of California

1    "immense fear for her safety and well-being, which have further manifested in the form of

2    physical symptoms such as hand tremors, palpitations, and severe trauma."  Opp'n at 5–6; Luna

3    Decl. at ¶ 10.  Such "constant encounters" have caused her subsequent physical and emotional

4    harm and given rise to her intentional efforts to steer clear of the offending inmate.  Opp'n at 6;

5    Physician's Notes.

6         In *Freitag*, a female correctional officer brought suit under Title VII against CDCR,

7    alleging hostile work environment.  *See* 468 F.3d at 532.  She encountered pervasive exhibitionist

8    behavior by a male inmate over a period of several months.  In affirming a jury's finding of hostile

9    work environment, the Ninth Circuit found sufficient evidence that the plaintiff was "repeatedly

10   exposed to conduct of a sexual nature."  *Id.* at 540.  Specifically, "constant barrage of sexual abuse

11   that, according to the testimony at trial, was allowed to continue virtually unfettered for the

12   duration of Freitag's employment at the prison."  *See id.; see also Gales v. California California*

13   *Dep't of Corr. & Rehab. Ventura Youth Corr. Facility*, No. CV 19-5025-GW-AGRX, 2021 WL

14   342571, at *22 (C.D. Cal. Jan. 28, 2021) (The defendant argued that one racist incident (display of

15   a noose) did not change the terms and conditions of the plaintiff's employment because any change

16   in this regard can also be attributed to the plaintiff's own decision to take leave.  The court noted

17   that this was a "one-sided view of the evidence, and also not fairly-reflective of the hostile work

18   environment-based theory recognized in *Harris*. (citing *Harris v. Forklift Systems, Inc.,* 114 S.Ct.

19   367, 370 (1993) ("A discriminatorily abusive work environment, even one that does not seriously

20   affect employees' psychological well-being, can and often will detract from employees' job

21   performance, discourage employees from remaining on the job, or keep them from advancing in

22   their careers.")).

23        Here, Plaintiff's encounters with the offending inmate, even viewed in the light most

24   favorable to her, are distinguishable from the facts in *Freitag*.  As to the single IEX incident, that

25   alone would not constitute sufficient sexual harassment by itself to create a hostile work

26   environment.  In *Brooks*, the Ninth Circuit found that a single incident of physical assault where

27   the defendant improperly touched plaintiff's stomach and breast was insufficient to support a

28   hostile work environment claim.  229 F.3d at 924.  The court addressed *Al–Dabbagh v.*

*Greenpeace, Inc.*, 873 F.Supp. 1105, 1111 (N.D.Ill.1994), where a single incident *was* found sufficient to survive a motion to dismiss because the assailant "slapped [the plaintiff], tore off her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him." *See Brooks,* 229 F.3d at 926. *Powell v. Morris* is instructional given the context of the work environment in the instant case – Plaintiff works at CMF which houses and treats inmates with mental health issues. The plaintiff in *Powell*, a correctional employee, brought Title VII hostile work environment claim against her employer for sexually offensive conducts of inmates. *See* 37 F. Supp. 2d at 1016-18. The court found only one incident of alleged "sexual assault," which led to disciplinary actions against the offending inmate. *Id.* The court was not convinced by the plaintiff's assertion that sex offenders were allowed to "roam unguarded and unsupervised" because her own testimony suggested that a guard was always stationed outside her office and inmates working in her area had to go through a rigorous selection process. *See id.* at 1018. As for another incident where another inmate unzipped his pants and made motions of masturbation when the plaintiff was walking down a hallway (plaintiff ran away, filed an incident report, but did not follow up on it), the court found it "a one-time incident, and 'isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (citing *Faragher,* 118 S. Ct. at 2283). The court granted the defendant's motion for summary judgment with respect to prisoner harassment, noting that "[a]s a single incident of prisoner lewdness, which Plaintiff should have expected or at least contemplated as part and parcel of a prison environment, this episode hardly rises to the level of a pervasively hostile environment." *Powell,* 37 F. Supp. 2d at 1018.

Plaintiff has not made a convincing showing how the subsequent encounters in October and November created a hostile work environment. While Plaintiff did raise safety concerns with Defendants regarding the three subsequent encounters, none of them warranted guard intervention or disciplinary actions, and only one incident involved exchange of words.[5] None of the

---

[5] The other incident ended with Plaintiff ordering the inmate to leave her classroom:

"So I looked around, and just 5 feet away from me, inside the classroom already, is Inmate Clifton. So I got scared, I stepped

13

encounters in themselves were sexual or violent in nature.  Although Plaintiff may have felt

threatened, that threat was predicated on the IEX incident which did not come close to creating a

hostile work environment.  As such, viewing the single IEX incident in conjunction with the

subsequent non-physical encounters, the inmate's overall conduct does not display a level of

(physical) seriousness and potential harm that warrants a reasonable finding of "continuing

abuses" or "multiple occasions of harassment."  *See, e.g., Freitag,* 468 F.3d at 540; *Meritor Sav.*

*Bank, FSB v. Vinson,* 477 U.S. 57, 60–61 (1986) (finding hostile work environment where the

employee had been subject to unwelcomed sexual advances on multiple occasions and out of fear

of losing her job).

The Ninth Circuit in *Ellison*, adopting the perspective of a reasonable victim, found hostile

work environment where the course of abusive conduct directed at the plaintiff took place in an

office setting and intensified over time.  *See* 924 F.2d at 873-75.  The employer in *Ellison* not only

failed to timely halt the harasser's unwanted sexual advances, but also reassigned the harasser

back to work with the plaintiff after a cooling-off period.  *See id.*  Defendants here, without

obvious delay, disciplined the offending inmate, referred him for prosecution, and removed him

from Plaintiff's group classes.  The inmate's sexual misconduct, rather than having escalated,

occurred only once.  In addition, Plaintiff works at a state prison medical facility where one could

have reasonably expected to interact with inmates with mental health conditions and encounter

some dysfunctional behaviors.  *See Freitag,* 468 F.3d at 540 ("Although it certainly would have

been reasonable for Freitag to anticipate substantial inmate misbehavior, given the severity of the

crimes committed by those incarcerated at Pelican Bay . . . she also had reason to expect that

---

back."  "But I—I was able to step back a little bit, so that—maybe like 7 feet away."  "And then he said that he wants to be in the nursing group long time, and he enjoyed my group."  "And then I told him—I was able to say, 'Step out of the—my room right now,' in a respectful way.  And that's how I had to do it because we don't want him to snap."  "So I asked him that.  And he did not, he did not go out; he did not follow my order.  And he said—I—I just don't remember.  He said something else.  But I said it for the second time, said something else.  But I said it for the second time, 'step out of my room now.'  And finally he followed."

Plaintiff's Deposition, at 74:20-76:2.

prison officials would seek in good faith to control the most extreme forms of sexual misconduct.") (internal citation omitted).  As such, considering the totality of the circumstances, the context of prison environment and Plaintiff's job duties, there appears to be no reasonable ground to characterize what she experienced as "constant barrage of sexual abuse" or repeated exposure to sexual conduct.

In any event, the Court need not decide the question whether Plaintiff has made a sufficient showing of a hostile work environment to survive summary judgment.  Plaintiff has failed to offer sufficient evidence to show Defendants' responses to her sexual harassment complaints were unreasonable or inappropriate and thus has not established a basis for Defendants' liability.

2.    Defendants' Response and Liability

An employer can be liable for sexual harassment caused by a third party, as in this case, if the employer "ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Freitag,* 468 F.3d at 538.  However, it may avoid liability by undertaking remedial measures reasonably calculated to end the harassment. *Dawson v. Entek Int'l,* 630 F.3d 928, 940-41 (9th Cir. 2011) (citations and quotation marks omitted).  "The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'" *Dawson,* 630 F.3d at 940-41 (quoting *Nichols v. Azteca Rest. Enter., Inc.,* 256 F.3d 864, 875 (9th Cir.2001).  "To be adequate, an employer must intervene promptly." *Dawson,* 630 F.3d at 940-41 (internal citation omitted).  Remedial measures may include some form of disciplinary action proportionate to the seriousness of the offense; Title VII requires more than a mere request to refrain from discriminatory conduct. *Id.* (internal citations omitted).

Defendants argue that because they responded to the IEX incident and Plaintiff's safety concerns promptly, reasonably, and in accordance with applicable rules, they cannot be found liable for the actions by the offending inmate. *See* MSJ at 17-18.  Defendants' response included: (1) after Plaintiff reported the IEX incident, the inmate was set for a disciplinary hearing on March 12, 2018.  (2) A Senior Hearing Officer found the Inmate Patient "guilty to the charge of IEX without prior convictions for PC 314 a Division "D" offense which is in violation of CCR Section

15

3007 wherein this act is prohibited."  (3) The inmate was disciplined by losing a number of privileges for 90 days, credits, being prohibited yard access for 10 days, and being required to wear an exposure control jumpsuit for 90 days.  (4) Placards were placed in his cell windows limiting the Inmate Patient's view of staff for 90 days.  (5) The case was referred to the Solano County District Attorney for criminal prosecution.  (6) The inmate was permanently banned from attending Plaintiff's classes.  MSJ at 19; Exhibit D to Abbasciano Decl. ISO MSJ.

With respect to applicable rules and protocols, Defendants contend that Plaintiff acknowledged CDCR's compliance with departmental policies concerning inmate sexual misconduct.  She signed an "Employee Report of sexual Misconduct" form and answering "Yes" to the question "Was departmental policy concerning inmate sexual misconduct followed?"  Exhibit D to Abbasciano Decl. ISO MSJ.

Defendants further argue that the effectiveness of their response was evidenced by the fact that Plaintiff did not report any subsequent IEX incidents concerning the inmate or any other inmates.  MSJ at 19.  Defendants contend that the subsequent encounters were simply unavoidable because both Plaintiff and the inmate needed to access the same "O-2" building (and the same hallway) for group classes and for medical appointments, and that they cannot be reasonably expected to punish the inmate for simply looking at Plaintiff or for walking down the same hallway.  Reply at 9-10.  Overall, Defendants argue that because Plaintiff understood the nature of working at CMF around inmates with mental health issues, and there has been no encounter since the IEX incident that required intervention or discipline, Defendant's response was sufficient to preclude its liability under Title VII.  Reply at 10-11.

Plaintiff generally argues that "Defendants' inaction, disinterest, and flagrant disregard for the safety of Plaintiff exhibits an unequivocal ratification or acquiescence in the harassment she faced."  *See* Opp'n at 8.  While Plaintiff's briefs suggest she had several requests and expectations[6] relating to her experience, one particular need—that she wishes to be segregated

[6] (1) disciplinary actions and prosecution; (2) zero exposure to the offending inmate and alternative work opportunities; (3) other actions pursuant to CDCR/CMF's policies; (4) handling of the CDC 128-B form; (5) accommodations relating to permanent restrictions; (6) accommodations to prevent her exposure to the inmate.

United States District Court
Northern District of California

from the offending inmate at all times—appears most important to her.  Plaintiff argues that "no evidence" shows Defendants "took any action whatsoever in response to Plaintiff's request for accommodation," and this is not reasonable "given the continuing abuse suffered by Plaintiff each time she encountered the offending inmate."  Opp'n at 2.

Specifically, Plaintiff asserts several times in her opposition that the inmate was not banned from (entering) Plaintiff's classrooms.  *See* Opp'n at 2, 7, 8.  But she does not dispute that the inmate was permanently banned from attending her classes.[7]

Evidence shows that soon after the IEX incident, the offending inmate was segregated, disciplined, prosecuted, and banned from Plaintiff's group classes.  Plaintiff's Deposition at 31:10-16;[8] 38:13-17.[9]  The remaining inquiry is whether Defendants should have reasonably accommodated Plaintiff's additional requests, including ensuring zero contact with the offending inmate.[10]

Regarding accommodation of preventing any incidental contact with the inmate, Plaintiff argues that even it is physically impossible for the offending inmate to receive his treatment at

---

[7] Defendants contend that "it is undisputed that CDCR permanently banned the Inmate Patient from attending Plaintiff's group classes, and Plaintiff herself admitted this fact in her deposition." Reply at 7; Plaintiff's Deposition at 31:10-16; 38:13-17; 44:24-45:6.

[8]

> Q. Prior to that day, February 9th, 2018, how long had you had Inmate Clifton in your class?
> A. As soon as that indecent exposure with masturbation happened, he was removed from my class.

[9]

> Q. After that February 9, 2018, was Inmate Clifton removed from your group classes, or was he still a group member in your classes?
> A. No. He was immediately removed from my class after that February 9th incident.

[10] There appears to be some inconsistency regarding Plaintiff's assertion that Defendants failed to offer her safer alternative work opportunities.  Plaintiff indicated that she was "open to accepting any other job in order to preclude any further encounters with the offending inmate" and "there are no documents whatsoever showing any offers to Plaintiff to work in different local facilities and her denial of such offers." Opp'n at 7-8 (citing Luna Decl. at ¶13).  But Plaintiff states in her deposition that this is the only position that works for her schedule and is convenient for her to attend to family needs.  Plaintiff's Deposition at 24:16-19; 79:20-80: 1.  Defendant's representatives also stated during deposition that offers were made, at least verbally, to Plaintiff to transfer to another building or a nearby facility.  *See* Exhibit 2 to Abbasciano Decl. ISO Reply at 21:14-23:9; Exhibit 3 to Abbasciano Decl. at 42:1-43-6.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    CMF while avoiding crossing paths with Plaintiff, it is possible to use walkie-talkies and inform

2    Plaintiff when the offending inmate is in the hallway.  Opp'n at 7.  Plaintiff notes that the inmate

3    could have also been transferred to a different facility, although she concedes this would be

4    "contingent on factors such as the inmate's enemy situation, classification score, among others."

5    Opp'n at 7-8.  But as Defendants contend, Plaintiff's suggestion that she be informed of the

6    inmate's whereabouts is unreasonable because "Defendants cannot reasonably be expected to

7    implement procedures in response that disrupt the entire facility's operations and inmates' medical

8    treatment."  Reply at 12.  With respect to permanent restrictions on the offending inmate's

9    movements, Defendants argue that it is "not viable because it would be an unlawful deprivation of

10   liberty without due process."  Reply at 12.  In addition, Defendants note that the inmate cannot be

11   banned from accessing the O-2 building to receive medical treatment because CDCR has a duty to

12   protect inmates' right to adequate medical care under the Eighth Amendment and relevant case

13   law.  Reply at 12 (citing *Coleman v. Wilson,* 912 F.Supp. 1282 (E.D. Cal. 1995); *Coleman v.*

14   *Schwarzenegger,* 922 F.Supp.2d 882, 898, 899 (E.D. Cal. 2009)).

15        Plaintiff also argues that the unreasonableness of Defendants' response is evident from the

16   fact that "no documents whatsoever showing any offers to Plaintiff to work in different local

17   facilities and her denial of such offers," even though she was "open to accepting any other job in

18   order to preclude any further encounters with the inmate."  Opp'n at 8; Luna Decl. at ¶ 13.  In

19   response, Defendants point out that Plaintiff's assertion of this failure to accommodate should be

20   disregarded because it was not raised in the complaint and not at issue in this case.  Reply at 11.

21   On the specific requests, Defendants contend that Plaintiff never asked for a transfer, declined

22   offers to work in a different building or facility,[11] and bid again for the same position at CMF in

23   ────────────────────

24   [11]

25             "Offers were made to Ms. Luna to—to transfer to the mental health
             crisis bed area, which is a freestanding building that is not within the
26             main corridor of CMF, which would have drastically decreased the
             chance of Ms. Luna coming across the patient, and that was
             declined.  And I believe that another request was made to consider
27             Ms. Luna moving to the institution that is right next door, which is
             CSP Solano, which would have 100 percent guaranteed that Ms.
             Luna would not have come across the patient, and that was declined
28             as well."  Exhibit 3 to Abbasciano Decl. ISO Reply at 42:1-43-6.

                                                    18

October 2021.  *See* Reply at 7.

        Even if viewing the evidence in Plaintiff's favor, Plaintiff fails to show Defendants' responses were *unreasonable*.  Remedial measures do not fail to be "reasonably calculated to minimize such harassment and protect the safety of its employees" simply because they fall short of victim's expectations.  *Freitag,* 468 F.3d at 541.  Here, Plaintiff conceded that Defendants followed existing policies or protocols during their handling of her IEX incident and the subsequent encounters.[12]  *Compare id.* at 541 (The court found that the defendants failed to sufficiently invoke their own prescribed measures—"the correctional staff controls inmates primarily by the inmate disciplinary process, physical restraints, revocation of privileges, and referral for criminal prosecution.").  Neither has Plaintiff offered evidence showing Defendants' handling of the IEX incident was delayed, reluctant, or ineffective in preventing future IEX incidents, or that her subsequent encounters with the inmate amounted to harassment or misconduct that required intervention or disciplinary actions.  As for the suggestion that Defendants' staff could use walkie-talkies to warn Plaintiff every time the inmate is in her vicinity, considering the number of inmates accessing the building each day and the practical difficulties in implementing such an early warning system, the Court does not find it unreasonable for Defendants to deny this accommodation.

        As such, Plaintiff has not presented evidence enough to allow a reasonable jury to conclude that Defendants' response is so insufficient as to "ratify or acquiesce in the harassment." *Freitag,* 468 F.3d at 538.  The Court accordingly **GRANTS** Defendants summary judgment on the Title VII claim.

---

*See also* Exhibit 2 to Abbasciano Decl. ISO Reply at 21:14-23:9 (testimony by Defendants' witness suggesting there were conversations between Defendants and Plaintiff regarding the possibility of transferring to another facility).

[12] As for the CDC form 128-B Plaintiff filed relating to the subsequent encounters, Plaintiff complains that nothing indicates Defendants reviewed it or took actions accordingly.  However, it appears that Plaintiff has not put forward any evidence or suggesting Defendants have a duty to timely review or act on form 128-B filings.  As such, a lack of action on the form 128-B seems to be an unpersuasive basis for establishing Defendants' unreasonable or inappropriate response.

19

United States District Court
Northern District of California

B.     State-Law Claim

Defendants argue that Plaintiff's state law claims fail as a matter of law because (1) public entities can only be sued for statutory claims and (2) the Workers' Compensation Act preempts state law claims. *See* MSJ 20-21.  Defendants also argue that the state law claims fail on the merits. *See* MSJ at 22-24.

The Government Claims Act (Tort Claims Act) (§ 810 et seq.) states:  "Except as otherwise provided by statute:  [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov. Code, § 815, subd. (a).  "This section abolishes all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the state or federal constitution, e.g., inverse condemnation . . . [T]he practical effect of this section is to eliminate any common law governmental liability for damages arising out of torts."  § 815 Leg. Comm. Comments.  The California Government Code § 815 provides:

> Except as otherwise provided by statute:  (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person. (b) The liability of a public entity established by this part (commencing with Section 814) is subject to any immunity of the public entity provided by statute, including this part, and is subject to any defenses that would be available to the public entity if it were a private person.

Cal. Gov. Code, § 815.  Although Plaintiff has not identified a specific statutory basis for correctional officers to bring tort claims against prisons (*cf.* Government Code § 844.6 which allows prisoners to sue prison/parole officials for money damages for their wrongful act/negligence/failure to act), she cannot prevail here because any such claim is preempted.

"California's Workers' Compensation Act provides an employee's exclusive remedy against his or her employer for injuries arising out of and in the course of employment." *Wright v. State,* 233 Cal.App.4th 1218, 1229 (2015).  *See* Cal Labor Code § 3602 ("(a) Where the conditions of compensation set forth in Section 3600 concur, the right to recover compensation is, except as specifically provided in this section and Sections 3706 and 4558, **the sole and exclusive remedy of the employee or his or her dependents against the employer**.") (emphasis added).  The Act

United States District Court
Northern District of California

20

preempts claims based on physical or emotional injuries, including claims for intentional infliction of emotional distress, arising out of and in the course of employment. *See Yau v. Santa Margarita Ford, Inc.,* 229 Cal.App.4th 144, 161 (2014); *Erhart v. BofI Holding, Inc.*, 269 F.Supp.3d 1059, 1080–1081 (S.D. Cal. 2017) ("Under California law, workers' compensation provides the exclusive remedy for an intentional infliction of emotional distress claim that is based solely on alleged personnel activity.").  The Court agrees with Defendants that because Plaintiff's claims "arise from the inherent occupational hazard of caring for mentally ill inmates," her harassment claims based on negligence should be preempted by the Workers' Compensation Act.  *See* MSJ at 21 (citing *Gregory v. Cott,* 59 Cal.4th 996 (2014) (The California Supreme Court denied a nurse assistant's claims based on an assault by an Alzheimer patient.  Because the plaintiff "placed herself in a position where she assumed the duty to take care of [Alzheimer] patients who were potentially violent and to protect such patients from committing acts which might injure others."  The court stated that "[a]fter weighing the public policies involved, we agree with those sister-state jurisdictions which have concluded that workers' compensation, rather than tort recovery, is the appropriate means of compensating hired caregivers for injuries caused by Alzheimer's patients.")).

As such, the Court **GRANTS** Defendants' motion for summary judgment on Plaintiff's state law claims.

C.   <u>Statutes of Limitations</u>

Defendants raised and later withdrew their argument that Plaintiff's Title VII claim is time-barred.  Reply at 7.  Defendants still contend that Plaintiff's state law claims are time-barred because they are subject to a two-year statute of limitations and claims that occurred prior to November 12, 2018 are barred (Plaintiff filed this suit on November 12, 2020).  The only encounter that occurred after November 12, 2018 was the inmate entering Plaintiff's classroom asking if he could attend her classes.  *See* Cal. Code Civ. Pro. § 335.1 (The time of commencing actions other than for the recovery of real property [is] [w]ithin two years:  An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another.).

United States District Court
Northern District of California

Notably, Plaintiff does not respond to Defendants' argument regarding the state law claims' timeliness, and thus dismissal of the state claims is warranted.  In any event, the Court also finds that the claims are preempted, and summary judgment is thus proper.

**V.      CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment is **GRANTED** on the hostile work environment claim because the Court finds no genuine dispute of material fact that Defendants' remedial measures were sufficient or reasonable, and **GRANTED** on the state law claims because they are barred by the Tort Claims Act, the Workers' Compensation Act, and the statute of limitations.

This order disposes of Docket No. 30.  The Clerk is instructed to enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: April 28, 2022

_____
EDWARD M. CHEN
United States District Judge